1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  ROSS C. MOODY
   Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5960
8  Fax: (415) 703-1234
      Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10                 IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13

14  **JAMES E. JOHNSON,**                        C 07-2574 JF (PR)

                                    Petitioner,
15

         **v.**
16

17  **KATHY PROSPER, Warden,**

                                    Respondent.
18

19
         **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
20            **RESPONDENT'S ANSWER TO ORDER TO SHOW CAUSE**

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  ROSS C. MOODY
   Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5960
8  Fax: (415) 703-1234
     Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  | JAMES E. JOHNSON, | C 07-2574 JF (PR) |

    **JAMES E. JOHNSON,**                    C 07-2574 JF (PR)

                              Petitioner,    **MEMORANDUM OF POINTS
                                             AND AUTHORITIES IN
                                             SUPPORT OF
                v.                           RESPONDENT'S ANSWER
                                             TO ORDER TO SHOW
    **KATHY PROSPER, Warden,**               CAUSE**

                              Respondent.

19                         **STATEMENT OF THE CASE**

20          In an information filed by the District Attorney of Santa Clara County on February 14,

21  2003, Petitioner James Johnson, co-defendants Jason Gentry, Jahtmari Davis, and Michael Joiner

22  were charged as follows: Counts 1 through 3, first degree home invasion robbery (Cal. Penal Code,

23  § 213, subd. (a)(1)(A));[1] Count 4, burglary (§ 459); Counts 5 through 7, false imprisonment (§§ 236-

24  237); and Count 8, assault with a deadly weapon (§ 245, subd. (a)(1)).  As to the first seven counts

25  it was alleged that each defendant was armed (§ 12022, subd. (a)(1)) and that petitioner Johnson

26  personally used a BB gun (§ 12022, subd. (b)(1)).  It was also alleged that petitioner had suffered

27  _____

28          1.   Unless otherwise noted, all statutory references are to the California Penal Code.

1   one prior conviction under the "Three Strikes" law.  CT 213-225.[2/]

2          On May 12, 2003, co-defendant Davis entered a negotiated guilty plea on counts 1 through

3   3 in exchange for a three-year prison sentence.  CT 264.

4          On June 5, 2003, a jury convicted  petitioner of all charges and enhancements.  Supp. CT

5   268-269. Defendant Gentry was convicted of all charges except count 8 (assault with a deadly

6   weapon) and the arming allegation.  CT 399-427.  The jury was deadlocked as to defendant Joiner

7   and a mistrial was declared.  CT 304.

8          On June 6, 2003, the trial court found petitioner's prior strike allegation to be true.  Supp.

9   CT 306-308.

10         On January 13, 2003, the court sentenced petitioner to prison for 21 years.  Supp. CT 332-

11  336.

12         On December 1, 2005,  the California Court of Appeals affirmed petitioner's conviction

13  in an unpublished decision.  On March 22, 2006, the California Supreme Court denied petitioner's

14  petition for review.   On May 15, 2007, petitioner filed the instant habeas petition in this Court.

15                         **STATEMENT OF FACTS**

16         The state court of appeal found the facts to be as follows.  This summary constitutes a

17  factual finding that is presumed correct under 28 U.S.C. § 2254(e)(1).  *Hernandez v. Small,* 282 F.3d

18  1132, 1135 n. 1 (9th Cir. 2002).

19         In August 2002, Jesus Aviles [FN2] lived on Felix Way in San Jose with Sofia
       Chicas and her boyfriend Jason Monroe. Chicas and Monroe sold marijuana to friends out
20     of their bedroom. However, they had never sold marijuana to an African-American.[FN3]

21         FN2. Aviles was known to his friends and referred to at trial as Tony.

22         FN3. Chicas testified under a grant of immunity. The jury was informed that
       she had recently been convicted of robbery and was awaiting sentencing.

23

24         On the afternoon and evening of Thursday, August 8, 2002, Chicas and Monroe had
       a small get-together at their home, and people were drinking and smoking marijuana there.
25     Later that night Joe Curiel came to the home. Curiel had a drink with Chicas and Monroe
       and bought some marijuana. While Curiel was there, Chris Henderson,[FN4] an African-
26     American, came to the house asking for Curiel. Neither Monroe nor Chicas knew

27  _____

28         2.  "CT" refers to the Clerk's Transcript which Respondent has lodged with this Court as
    Exhibit A1.

    Memorandum Of Points And Authorities - C 07-2574

                                    2

Henderson, and Curiel seemed surprised to see him. Henderson was obnoxious, and he and Curiel soon left. Chicas and Monroe went to bed around midnight.

FN4. Henderson was known and referred to at trial as Tweet.

Aviles arrived home around 2:30 a.m. on Friday, August 9, 2002, with his friends Shawn, Sarah, and Jamie, and parked down the street. As the four of them were walking toward Aviles' home, an African-American man wearing a stocking cap and a black sweatshirt came out from the bushes. The man screamed something and ran past them. Aviles and his friends continued on to his house and entered the backyard through a gate. The door to Aviles' room was open. When they looked into Aviles' room, Aviles and Shawn could see people inside. Aviles told his friends to run. Shawn and Sarah heard a noise like a gun shot coming from inside Aviles' room, and ran from the place with Jamie. The three of them hid behind a car in the driveway next door, and called for help. After they had been there for about 10 or 15 minutes, they saw three men run away. They then went back to Aviles' house, found Aviles, and waited for the police to arrive.

Aviles was standing outside the entrance to his room when an African-American man grabbed him and shot him on the left side of his head with a BB gun. The shot ruptured a vein causing Aviles to bleed profusely. The man then asked Aviles where "the dope" and money was, and pushed Aviles inside. Two other African-American men were inside, one with a crowbar, and all three of the intruders had their faces covered. The man who shot Aviles took him down the hall and told him to open the door to Chicas's room. Aviles yelled for Chicas to open her door, saying that a man had a gun to his head. Chicas opened the door, and the intruders ran into the room. Monroe was asleep on the bed, and one of the men pistol-whipped Monroe to wake him up.

While holding Aviles, Chicas, and Monroe at gunpoint, the three intruders asked where the money, marijuana, and the safe were. Chicas pulled a safe out from under the bed. The intruders also found a large vodka bottle containing about $2,000 to $3,000 in bills in the room. One of the intruders took Chicas out of the room to get the keys to the safe. Monroe took another intruder to the backyard where there was a broken safe. When Monroe was unable to open that safe, the intruder took Monroe back to his room. The intruders took the safe from the room, the keys Chicas gave them, the bottle of money, and a PlayStation from Aviles' room, and left.

Chicas saw the men run down Felix Way and turn right on Clara Felice. She followed them, and when she saw them start to jump a wall she returned home. On the other side of that wall is the Almaden Terrace Apartments.

Monroe and Chicas suspected that Henderson was involved in the incident. Chicas knew that Curiel was aware of the safe in her bedroom. After checking on Aviles, Chicas drove to Curiel's nearby home. She demanded that Curiel take her to Henderson's home. Curiel directed Chicas to the Almaden Terrace Apartments, and pointed to the stairs of one building that led to two apartments. Monroe waited for the police to arrive. When they did, Chicas directed the officers to the two apartments and went home. She later learned that one of the apartments was empty.Henderson is Johnson's cousin, and Gentry, Davis and Joiner are his friends. Henderson visited Johnson and his friends in the summer of 2002 at an apartment in the Almaden Terrace Apartments, where he once saw a BB gun. Henderson also knows Curiel. On August 8, 2002, Henderson went with Curiel to his friend's house in order to buy some marijuana. Henderson stayed in the car when Curiel went inside. After waiting about 30 minutes, Henderson went to the house and was let inside. He and Curiel left after a few minutes and smoked the marijuana in Curiel's car. Curiel then dropped him off at the apartments, and he went inside and fell asleep. He woke up and left the next morning. Although he told Detective John Mitchell on August

22, 2002, that he woke up during the night and saw Gentry, Davis, Johnson, and Joiner in the room counting money, and with marijuana and a black box, Johnson testified at trial that he made up the story because he was afraid that he was being identified as one of the participants in the robbery.[FN5]

FN5. Henderson testified that he was doing so under a promise from the district attorney that he would not be prosecuted for lying to the police, but that he could be prosecuted if he admitted being involved in the robbery.

Detective Mitchell interviewed Gentry on August 16, 2002. After waiving his *Miranda* rights,[FN6] Gentry said that he had been in the car with Henderson and Curiel when they went to the Felix Way home on August 8, 2002, to buy marijuana. He waited in the car with Henderson when Curiel went inside. At some point, Henderson also went inside the home, and came back with Curiel and marijuana. A plan was entered into at Gentry's apartment to rob the Felix Way home. Gentry said that a BB gun and a crowbar were used in the robbery. Henderson was not involved in the robbery. Gentry acted as the lookout and did not go inside the home. When some people came home during the robbery, Gentry called out a warning and ran back to his apartment. Gentry said that his cut from the robbery was $250. Mitchell found a crowbar in Gentry's Almaden Terrace apartment under his bed, where Gentry told him it would be. Mitchell also found a box of BBs in the apartment.

FN6. *Miranda v. Arizona* (1966) 384 U.S. 436 ( *Miranda* ).

Detective Mitchell interviewed Davis on October 9, 2002. After waiving his *Miranda* rights, Davis admitted being involved in the robbery but said that Henderson was not involved in the robbery.

Detective Mitchell and Officer Jeffrey Enslen interviewed Johnson at the police station for four hours on August 20, 2002. The interview was tape recorded, and the tapes were played for the jury. During the interview, Mitchell did not make any threats or promises that caused Johnson to admit anything. Johnson was arrested and the officers then took him to his car. Mitchell searched the car and found a doorknob inside a bag and a head cover that could also be used as a mask. Mitchell had earlier seen the doorknob in Gentry's apartment. Johnson was taken to jail and booked. Johnson then said that he wanted to talk some more about the case. He wrote out a statement, which was admitted into evidence as People's Exhibit 26. In the statement Johnson admitted being at a house early one Friday morning when some of the people he was with went inside. He stayed outside and ended up hitting a man with a BB gun during a scuffle, but he did not rob anybody or take any marijuana.

San Jose Police Officer Patrick Boyd interviewed Johnson in April 2000. At the time, Johnson was a suspect in a robbery that had occurred the previous month. Boyd informed defendant of his *Miranda* rights and Johnson acknowledged understanding his rights. Johnson said that he drove with two other individuals to a bank at Valley Fair and parked a little distance away. He and one of the other individuals went up to a man at the ATM who was carrying a deposit bag. The individual with Johnson threatened the man, demanded the bag, and got into a scuffle with the man, who was knocked to the ground. Johnson said that he did not actually participate in the assault. When Boyd told Johnson that this was contrary to what the victim indicated, Johnson continued to deny any physical involvement, but acknowledged that he was there and that he knew that the robbery was going to occur. He also said that the money in the deposit bag was divided amongst the three of them in the car. A certified copy of defendant's conviction for robbery as a result of this incident was admitted into evidence as People's Exhibit 8.

1

*The defense case*

2

Gentry testified that on the evening of August 8, 2002, he went with Curiel and Henderson to the Felix Way house to buy some marijuana. Curiel went inside and Gentry and Henderson waited in the car. Some time later, Henderson went inside and came back with Curiel. They all went and smoked some marijuana in the car. Curiel left and Gentry and Henderson then smoked some more marijuana at Gentry's Almaden Terrace apartment with Davis. Later that night, while Henderson was sleeping on the couch, Johnson and Joiner came to the apartment. Gentry went with Davis, Johnson, and Joiner when they walked over to the Felix Way residence. There, Davis said that they were going to rob it. He told Gentry to stay outside as a lookout, and the others went inside. Davis had a crowbar and Johnson had a BB gun. When Gentry heard some people coming, he shouted a warning and ran home. The others came back to the apartment with a black box, a bottle full of money, and a PlayStation. They broke the bottle, counted the money, and gave him about $100. He did not take more because he did not want to be involved. While they were still counting the money, Gentry heard Curiel's and Chicas's voices coming from outside near Johnson's former apartment. Then he saw the police arrive. Davis, Johnson and Joiner turned off the lights in the apartment. Henderson woke up while Davis, Johnson and Joiner ran around and hid the things that had been taken in the robbery.

3

4

5

6

7

8

9

10

11

Gentry further testified that Johnson, Davis and Joiner had been planning the robbery for a week or two. Curiel had told them that his "weed hookup" had "all this weed and all this stuff," including a lot of money. Gentry also heard Johnson, Davis and Joiner later talk about finding a pistol and a pound of marijuana in the black box. Detective Mitchell did not believe Gentry when he said during his August 16, 2002 interview that he never went inside the house and that Joiner was the third person involved in the robbery who did go inside.

12

13

14

15

*Verdicts, findings on prior allegation, and sentencing*

16

In the middle of trial, Davis entered into a negotiated plea agreement, a condition of which was a three-year prison sentence. Outside the presence of the jury, Johnson waived jury trial on the prior allegation. The jury found Johnson guilty of all charges, counts 1 through 8, and found true allegations that he personally used a deadly and dangerous weapon during the commission of counts 1 through 7. The jury found Gentry guilty of counts 1 through 7, but found him not guilty of count 8 and found all arming allegations as to him not true. The jury was unable to reach a verdict on any counts as to Joiner, and the court declared a mistrial as to him. The court found true the allegation that Johnson had a prior robbery conviction that qualified as a strike. The court sentenced Johnson to 21 years in state prison. The court suspended imposition of sentence as to Gentry and placed him on three years probation with various terms and conditions, one of which was that he not "go to places where illegal drugs are used or sold or alcohol is the chief item of sale."[FN7]

17

18

19

20

21

22

23

FN7. At the sentencing hearing the prosecutor stated that all of the jurors had approached him after trial and requested leniency for Gentry, and that two jurors had written letters on his behalf.

24

25

26

Exh. C, at 3-8.

27

28

Memorandum Of Points And Authorities - C 07-2574

5

1

**STANDARD OF REVIEW**

2     A federal court may grant a writ of habeas corpus to a state prisoner only if the state

3 court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application

4 of, clearly established Federal law, as determined by the Supreme Court of the United States" or

5 were "based on an unreasonable determination of the facts in light of the evidence presented" in the

6 state courts. 28 U.S.C. § 2254(d). Under the "contrary to" clause, a state court's decision is

7 contrary to federal law if it "contradicts the governing law set forth in our cases" or if it "confronts

8 a set of facts that are materially indistinguishable from a decision of this Court and nevertheless

9 arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000);

10 *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). If there is no Supreme Court precedent

11 that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be

12 contrary to, or an unreasonable application of, clearly established federal law. *Carey v. Musladin,*

13 127 S.Ct. 649, 653-54 (2006) (denying habeas relief in absence of clearly established federal law).

14     In order to warrant habeas relief, the state court's application of clearly established federal

15 law must not be merely erroneous, incorrect, or even "clear error," but "objectively unreasonable."

16 *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003); *see also Williams v. Taylor*, 529 U.S. at 409; *Woodford*

17 *v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). It is the habeas petitioner's burden to make that

18 showing. *Woodford,* at 25. In the same way, a "decision adjudicated on the merits in a state court

19 and based on a factual determination will not be overturned on factual grounds unless objectively

20 unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*,

21 357 U.S. 322, 340 (2003). State court factual determinations are presumed correct unless rebutted

22 by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

23     Even if the state court's ruling is contrary to or an unreasonable application of Supreme

24 Court precedent, that error justifies overturning the conviction only if the error had "substantial and

25 injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S.

26 619, 637 (1993). The *Brecht* standard applies to all section 2254 cases, regardless of the type of

27 harmless error review conducted by the state courts. *Fry v. Pliler*, ___ U.S. ____ , 127 S.Ct. 2321.

28

Memorandum Of Points And Authorities - C 07-2574

1

**ARGUMENT**

2

**I.**

3
4
5

**THE STATE COURT WAS NOT UNREASONABLE IN CONCLUDING THAT PETITIONER'S SIXTH AMENDMENT CONFRONTATION RIGHTS WERE NOT IMPLICATED BY THE ADMISSION OF TESTIMONY REGARDING HIS PRIOR ROBBERY CONVICTION**

6        Johnson contends the evidence of his 2000 robbery conviction was admitted in violation

7   of his rights under the Sixth Amendment's confrontation clause, as explicated in *Crawford v.*

8   *Washington*, 541 U.S. 36 (2004).  The state court rejected the claim on the basis that the testimony

9   was not hearsay as it was not offered to prove the truth of the matter asserted.  The state court's

10  conclusion was not objectively unreasonable.  In any event, the admission of the testimony did not

11  have a substantial or injurious effect on the verdict.

12    **A.  Background**

13        Prior to trial, counsel for petitioner indicated he intended to argue that his written

14  statement of August 20, 2002 – in which he said he was present at, but uninvolved in, the Felix Way

15  robbery – was the result of threats and promises made by Detectives Mitchell and Enslen during the

16  preceding four-hour interview.  *See* RT 6.  Counsel for petitioner also moved, pursuant to California

17  Evidence Code section 352, to prevent the jury from learning that he had suffered a prior felony

18  conviction (the ATM robbery in August 2000).  RT 6.

19        The prosecutor responded that if the defense were to argue that petitioner's August 20,

20  2002, statement was the result of coercion, then the evidence of his prior conviction would be

21  admissible for two reasons.  First, petitioner's 2000 robbery conviction would be relevant to show

22  that he was familiar with the criminal justice system, and therefore unlikely to have been coerced

23  into writing the August 20, 2002, statement.  RT 6-7.  Second, the prior conviction would be

24  admissible for impeachment, given that robbery is a crime of moral turpitude.  RT 8.  Still later, the

25  prosecutor argued that the 2000 conviction was independently admissible under California Evidence

26

27

28

Memorandum Of Points And Authorities - C 07-2574

1   Code section 1101, subdivision (b).[3/]  RT 602-606, 641-645.  The prosecutor noted that there were

2   a number of similarities between the ATM and Felix Way robberies.  In both cases, there were

3   multiple attackers who appear to have pre-planned the attack, the victims were struck in the head,

4   large amounts of money were stolen, and petitioner gave the same excuse in each case (i.e., he was

5   present during both robberies, but did not actively participate in either).  Given these similarities,

6   the prosecutor argued that the evidence of the 2000 robbery should be admitted to prove both

7   petitioner's identity as one of the Felix Way robbers, and to prove petitioner's "intent."  RT 602-

8   605, 641-645.

9       The superior court held the evidence of the prior conviction admissible for impeachment

10  and "to show [petitioner's] intent," but not to prove petitioner's identity as one of the Felix Way

11  robbers.  RT 10-11, 606, 645.  *See also* RT 1373-1375, 1914.  The court also ruled the evidence

12  more probative than prejudicial.  RT 617.

13      At trial, the prosecutor introduced documentary evidence of the 2000 conviction.  RT

14  1372, 1375.[4/]  San Francisco Police Officer Patrick Boyd then testified that he had interviewed

15  petitioner about the ATM robbery a few weeks after it occurred.  *See* RT 1376-1382.  Boyd said he

16  *Mirandized* petitioner at the outset of the interview, and that petitioner admitted he had driven to a

17  local Bank of America with some friends to commit the robbery.  RT 1376-1381.  Petitioner

18  insisted, however, that he had played a passive role in the robbery; he claimed he simply watched

19  one of his friends assault a man who was about to make an ATM deposit.  RT 1380-1382.  Boyd told

20

21      3.  Section 1101, subdivision (b) states as follows:

22          Nothing in this section prohibits the admission of evidence that a person
23      committed a crime, civil wrong, or other act when relevant to prove some fact (such
        as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of
24      mistake or accident, or whether a defendant in a prosecution for an unlawful sexual
        act or attempted unlawful sexual act did not reasonably and in good faith believe that
25      the victim consented) other than his or her disposition to commit such an act.

26      4.  The 2000 conviction was proven by the complaint, the change of plea form, the

27  sentencing minutes in Santa Clara County case number CC068021 (Exh. 8, Supp. CT 248-253), and
    the booking identification sheets for petitioner's prior and current arrests (Exh. 8A (Supp. CT 261-

28  262) and 8B Supp. CT 263-264.

Memorandum Of Points And Authorities - C 07-2574

8

petitioner that the victim had reported being assaulted by two men, but petitioner maintained he was

not actively involved.  RT 1382.

**B.    State Court's Analysis Of The Claim**

The state appellate court rejected the claim reasoning as follows:

Johnson moved in limine to exclude under Evidence Code section 352 evidence of his prior robbery conviction. The prosecutor sought to use the conviction for impeachment and to show intent under Evidence Code section 1101, subdivision (b). The court found that the offense was a crime of moral turpitude, and that the evidence was more probative than prejudicial, and ruled that the evidence was admissible for impeachment. The court also found the conviction admissible to show intent. The court subsequently instructed the jury that it could consider defendant's prior robbery conviction only on the issue of the existence of the necessary intent.

Johnson argues that the admission of evidence of his prior robbery conviction was prejudicial error. He contends that the prior robbery was not sufficiently similar to the charged offense to be admissible on the issue of intent. He contends that Officer Boyd's testimony regarding the facts of the prior, and of having confronted Johnson with what the victim said about it, was inadmissible hearsay and thus violated his right to confrontation as stated in *Crawford v. Washington* (2004) 541 U.S. 36 ( *Crawford* ).[FN8] He also contends that defense counsel's failure to object to Officer Boyd's testimony constituted ineffective assistance.

FN8. In Johnson's opening brief, he argues that the trial court also erroneously admitted into evidence the probation report regarding his prior conviction. However, in his reply brief, Johnson acknowledges that the probation report was removed from Exhibit 8 before it was admitted into evidence.

"Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, . . . the intent with which the perpetrator acted in the commission of the charged crimes. (Evid.Code, §§ 1101.) Evidence of uncharged crimes is admissible to prove ... intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of ... intent. [Citation.] On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion. [Citations.]" ( *People v. Kipp* (1998) 18 Cal.4th 349, 369.)

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation .]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' ' "probably harbor[ed] the same intent in each instance." [Citations .]'' [Citation.]" ( *Ibid.*)

In the instant case, whether Johnson harbored the requisite intent to rob the occupants of the Felix Way house was a disputed material issue. Johnson admitted being near a house early one Friday morning with a BB gun when others he was with went inside the house, but he denied taking part in a robbery there. In the prior robbery, Johnson admitted going to a bank with two other people with the intent to rob somebody, but denied taking part in the actual robbery. Johnson's prior robbery conviction had a strong tendency to prove that Johnson had the intent to rob somebody when he went with others to that house that early Friday morning. If a person acts similarly in similar situations, he probably

harbors the same intent in each instance [citations], and ... such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution. [Citations.]" ( *People v. Miller* (2000) 81 Cal.App.4th 1427, 1448, quoting *People v. Robbins* (1988) 45 Cal.3d 867, 879.) The evidence of Johnson's prior robbery was sufficiently similar to his statements regarding the charged offense to support the inference that he probably harbored the intent to rob in both incidents. The court did not abuse its discretion in admitting evidence of Johnson's prior robbery conviction.

Johnson contends that it was prejudicial error to allow Officer Boyd to testify that Johnson's version of what happened during the prior robbery was inconsistent with the victim's description of the event. He argues that Boyd's reference to the victim's statement about the event was inadmissible hearsay, and that admission of the testimony denied him his right to confront the witnesses against him. (*Crawford, supra*, 541 U.S. 36.) We disagree, as the testimony at issue was not hearsay; Boyd's testimony was not "evidence of a statement that was made other than by a witness while testifying at the hearing . . . that is offered to prove the truth of the matter stated." (Evid.Code, § 1200, subd. (a).)

Defendant acknowledges that his statements to Boyd about the prior robbery were admissible as an admission by a party. (Evid.Code, § 1220.) Boyd testified that he confronted Johnson with the fact that Johnson's statements to him were "contrary to what was indicated in the victim's statement," and that Johnson continued to deny participating in the actual assault and robbery of the victim. The prosecutor then asked Boyd: "Even though the victim's statement indicated two of them attacked him, Mr. Johnson said that he was not a part of the attack." Boyd responded: "Correct." This portion of Boyd's testimony was not hearsay as it was not offered to prove that Johnson was indeed part of the actual assault on the victim, but was offered to prove that Johnson denied being part of the actual assault even when confronted with a contrary claim by the victim. As Boyd's testimony regarding the content of the victim's statements was not offered to prove the truth of the matter stated, no *Crawford* error is shown, and counsel cannot be faulted for failing to object to the testimony.

Exh. C, at 10-11.

## C.    The Confrontation Clause Was Not Implicated By the Admission Of Boyd's Testimony

Officer Boyd's  comments that the victim and witness had reported that the 2000 attack had been carried out by two men did not violate *Crawford*.  In *Crawford*, the United States Supreme Court held that a testimonial hearsay statement of an unavailable-to-testify-witness is admissible only when the defendant has had the opportunity to cross-examine the witness.  541 U.S. at pp. 54, 59.  Alternatively, the statement is admissible if the declarant is available and testifies.  *Id.* at  59, n. 9.

*Crawford* did not formally define the term "testimonial," but stated that the confrontation

1   clause applies to statements by "'witnesses' against the accused – in other words, those who 'bear

2   testimony.'"   541 U.S. at p. 51. As examples of testimonial statements, *Crawford* cited prior

3   testimony at a preliminary hearing, testimony before a grand jury or at a former trial, and statements

4   made during police interrogations. *Id.* at pp. 51-52.

5           In this case, it is not clear whether Officer Boyd's discussion of Johnson's 2000 robbery

6   contained testimonial evidence.  Boyd mentioned that both the victim and a witness to the robbery

7   reported that the victim had been assaulted by two men.  Of course, if these comments had been

8   made during a formal police interrogation, they could have fallen within one of *Crawford*'s

9   examples of testimonial evidence.   On the other hand, if the statements had been made

10  spontaneously (e.g., excited utterances upon reporting the crime in a 911 call), they need not have

11  been testimonial.  *See, e.g.*, *Davis v. Washington,* 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)

12  (statements in a 911 call not testimonial).   Officer Boyd was not asked, and he did not describe, the

13  circumstances surrounding the reports of Johnson's 2000 robbery.  Because the record does not

14  show that those reports were testimonial, there is no basis for relief.

15          In any event, as the state court corrected observed, *Crawford*'s rule restricting the

16  admission of testimonial evidence only applies where a witness's statement is offered for the truth

17  of matter asserted.  *Crawford*,  541 U.S. at p. 59, n. 9.  Here, as found by the state courts,

18  petitioner's prior robbery was admissible to rebut the defense argument that his August 20, 2002

19  statement was coerced by showing  that he  had undergone formal police questioning about the prior

20  robbery, and that he had  maintained his claim of minimal involvement even after he was confronted

21  with contrary evidence.  Thus, Boyd's references to the reports of the victim and witness to the 2000

22  robbery did not violate *Crawford*.

23           Assuming arguendo petitioner's rights under the Confrontation Clause  were violated, the

24  error did not have a substantial and injurious effect on the verdict.  *Fry v. Pliler,* ___ U.S. ____ , 127

25  S.Ct. 2321.  Petitioner's  jury was instructed pursuant to CALJIC No. 2.50 to consider the evidence

26  of his other crimes only for the "limited purpose of determining if it tends to show the existence of

27  the intent which is a necessary element of the crime charged."  CT 332.  More important, the

28  prosecution case against petitioner lay primarily in the comprehensive statements of Gentry and

1    Henderson, both of whom reported that petitioner was actively involved in the Felix Way robbery.

2    Although the statements of Gentry and Henderson were the result of aggressive police questioning,

3    there can be no doubt that they were truthful.  Gentry admitted he was personally involved in the

4    robbery, and he and Henderson both knew details of the robbery that could only have been known

5    by people closely involved in it.  For example, both Gentry and Henderson knew that one of the

6    robbers had hit one of the victims in the head with a BB gun, and that the robbery loot included a

7    liquor bottle filled with cash and a strong box containing cash, marijuana, and a chrome-plated

8    handgun.  Also, Gentry's and Henderson's version of events were implicitly confirmed by the guilty

9    plea of Jahtmari Davis, a friend of petitioner's.  Petitioner and his friends generally met the

10   descriptions of the robbers, who were observed running from Felix Way toward the nearby Almaden

11   Terrace Apartments, where petitioner and his friends lived.  Recorded telephone calls strongly

12   suggested that petitioner and his girlfriend, Vanessa, dispatched Robert Billops to dissuade Sofia

13   Chicas from testifying against petitioner.  In light of this evidence as a whole, it cannot be said that

14   Officer Boyd's brief reference to statements that petitioner's 2000 robbery had been committed by

15   two people had a substantial or injurious effect on the jury's verdict.

16

17                                                **II.**

18                    **THE STATE COURT REASONABLY CONCLUDED THAT
                      PETITIONER'S STATEMENTS WERE PROPERLY OBTAINED**

19

20            Petitioner contends the oral and written statements he gave to the police on August 20,

21   2002, should have been suppressed because: (1) they were given in violation of *Miranda*, and (2)

22   they were given involuntarily, as products of threats and promises made by Detectives Mitchell and

23   Enslen.  The trial court heard all of the relevant evidence, including the tape recording of the

24   interview and testimony from petitioner and Detective Mitchell, and ruled to the contrary.  The state

25   appellate court found the trial court's credibility findings supported by the record and concluded that

26   the petitioner's oral and written statements were voluntary and not obtained in violation of *Miranda.*

27   The record supports its findings.  Petitioner has not established that its rejection of these claims was

28   objectively unreasonable.

### A.   Factual Background

In a pre-trial hearing on petitioner's motion to suppress his August 20 statements, Detective Mitchell testified that he and Detective Enslen contacted petitioner at work and asked if he would speak with them. RT 25-26. Petitioner agreed and the detectives drove him to the police station, where they tape-recorded the interview. RT 26-28. At the outset of the interview, the detectives *Mirandized* petitioner and said he was free to leave at any time. RT 29-30, 46, 49. At no time did petitioner ask to speak to an attorney or terminate the interview.

The detectives' interview techniques were aggressive. Among other things, they told petitioner that they had physical evidence (like fingerprints and DNA) placing him inside the burglarized apartment, and that a number of witnesses had identified him as one of the robbers. *See* RT 1196-1200. They also said that the robbery of a drug dealer was "no big deal," particularly if the robber did not initiate violence or use a real gun. *See RT* 1200-1207. They warned petitioner that he faced as much as 50 years in prison if he had used a real gun to rob multiple victims. RT 1207-1208. They also said he would never have another opportunity to tell his side of the story after the interview ended. RT 1207-1208. Throughout the interview, petitioner insisted he had "nothing to do with" the robbery. RT 1207.

At the conclusion of the interview, the detectives searched petitioner's car (with his permission), and then took him back to the county jail for booking. RT 31-35. Petitioner asked to re-open their discussion, and Mitchell gave him a pen and paper and told him to write a statement summarizing the incident. RT 38-40. Petitioner went into a private room and wrote Exhibit 26. RT 41.

Petitioner testified at the suppression hearing that he wrote Exhibit 26 under coercion. He said he did not believe he could refuse to talk to the detectives because he was on probation. RT 306. The police never told him he could leave, and he felt threatened by everything they said. RT 307, 313. Although he had been given *Miranda* warnings at the outset of the interview, he had forgotten them after about an hour. RT 312. His written statement was based entirely on suggestions Mitchell had made during the interview. RT 323-326.

Memorandum Of Points And Authorities - C 07-2574

1    On cross-examination, petitioner acknowledged that Detective Mitchell's conduct of the

2  interview was *not* coercive:

3    BY MR. PITSKER (THE PROSECUTOR):
     Q.    During that four hour interview Detective Mitchell did not make any threats to
4          you that caused you to change your answers or to admit to anything, fair?
     A.    Fair. True.
5    Q.    Similarly, he also didn't make any promises to you during that four hour
           interview to get you to admit to any involvement in this case, fair?
6    MR. CLIFT:        Vague as to time.
     MR. PITSKER:      I said –
7    THE COURT: He said the whole time.
     THE WITNESS:    He told me he could make things right.
8    BY MR. PITSKER:
     Q.    I understand that, but there were no promises that actually caused you or
9          elicited from you any of the admissions that he was looking for, fair?

10   A.    Fair.
     Q.    In fact, during the four hour interview he called you a liar, he yelled at you, he
11         said your denials were bullshit, right?

12   A.    Yes.
     Q.    He also said that there were other witnesses who identified you as being a
13         participant in the robbery, right?

14   A.    Yes.
     Q.    He played Jason Gentry's tape in which Jason actually does say you were
15         involved. He played that tape for you, so you knew he had this information
           against you, right?
16
     A.    Yes, he played the tape.
17   Q.    And you heard Jason Gentry identifying you as being one of the suspects
           involved in the robbery, right?
18
     A.    Yes, I did.
19   Q.    And Detective Mitchell also referred to possible fingerprints linking you with
           the robbery, right?
20
     A.    Yes, he did.
21   Q.    With all of this, all of this yelling, all of this information that Detective Mitchell
           was throwing at you, you still stood your ground and said I'm not admitting in
22         this case, fair?

23   A.    Fair.
     Q.    None of these caused you to buckle over and admit one iota of being involved
24         in this robbery?

25   MR. CLIFT:   Vague as to time.
     BY MR. PITSKER:
26   Q.    During the four hours, right?
     A.    Yes.
27

28 RT 434-435.

1          Later, on re-cross-examination, petitioner made a similar admission:

2      BY MR. PITSKER:
       Q.        A few more questions, Mr. Johnson.  This isn't going to last much longer.
3                Going back to a little while ago when your attorney again brought up the issue
                 that you felt intimated and scared, and when you were cut-off by Detective
4                Mitchell during the four hour conversation.  In regard to that issue, you still
                 knew that you had the right to remain silent, and you could have told Detective
5                Mitchell take a hike, buddy, I don't want to talk to you.  You knew that, and
                 you didn't do it; is that right?
6      A.        That's right.

7  RT 490.

8          Petitioner claimed on further cross-examination that he had twice asked the detectives if

9  he could talk to a lawyer, but they refused his request.  RT 438-439.  Petitioner added that he wrote

10 Exhibit 26, "word for word," pursuant to Detective Mitchell's dictation.  RT 448, 450-452.

11         The trial court denied Petitioner's motion to suppress:

12     THE COURT: Detective John Mitchell is an aggressive investigating officer.  The
       evidence before me so indicates he has a distinctive style, and it runs throughout the tapes
13     of his interviews, and I listened to all of them.  He is scrupulous in making sure he reads
       the *Miranda* rights early on in all the interviews.  Moreover, he makes sure that the person
14     he is interviewing answers audibly to questions, and thus, I think goes to a good
       understanding of the rights.
15
       All the evidence supports this.  The validity of *Miranda* waivers are viewed in the light
16     of totality of circumstances.  There's well-settled case law that investigating officers have
       wide birth [sic] in techniques and questions that can be used to elicit information.
17
       These are Johnson's motions, okay?  Mr. Johnson's motion this Court finds the defendant
18     freely, voluntarily, and knowingly waived his *Miranda* rights, and that's beyond a
       reasonable doubt, I believe, Detective Mitchell.
19
       Defendant Johnson has a prior felony conviction.  In that conviction he went through, he
20     said himself on the stand, that he went through the *Miranda* rights, and he understood
       them.  On the stand he, although he said that he plead [sic] guilty because he was guilty;
21     however, he denied this to his probation officer in the probation report that was submitted
       to me.  At least his credibility is suspect to put it in charitable light.  I do believe Detective
22     Mitchell, and so I find that his *Miranda* rights were not violated, and I find that beyond
       a reasonable doubt in regard to Johnson.
23
       Also I find there was no coercion, and I think the tapes speak for themselves, and, as I
24     indicated, I feel that Mr. Johnson's credibility is suspect.  So [Johnson's] motions are
       denied.
25
   RT 514-515.
26
       **B.    The State Appellate Court's Analysis Of The Claim**
27
           The state appellate court rejected the claim reasoning and finding as follows:
28

Memorandum Of Points And Authorities - C 07-2574

Johnson moved in limine to exclude his oral and written statements to police regarding these offenses. At the Evidence Code section 402 hearing on the motion, Detective Mitchell testified that on August 20, 2002, at about 7:30 p.m., he and Detective Enslen contacted Johnson at work and requested that Johnson accompany them to the police station. Johnson agreed to do so and Mitchell told Johnson that he was free to leave at any time. Neither Mitchell nor Enslen displayed any weapons during the subsequent interview, which lasted about four hours and was tape recorded. Mitchell informed Johnson of his *Miranda* rights at the beginning of the interview and asked Johnson if he understood each of these rights. Johnson responded that he did. Mitchell then interviewed Johnson without asking for an express waiver of these rights. At no time during the interview did Johnson express a desire to exercise his rights and to stop the interview.

Mitchell told Johnson that he was identified as a suspect in a robbery, and told him that there was evidence that he was involved. Throughout the entire interview, Johnson denied being present at the time of the robbery. Mitchell repeatedly called him a liar, and yelled at him, but Johnson did not give out any information. Mitchell placed Johnson under arrest about an hour before the interview ended. After the interview ended, Mitchell began the pre-booking process with Johnson. During the process, Johnson asked to have his car keys released. Mitchell indicated that he would not need the car keys once he completed a search of Johnson's car.[FN9] Johnson then agreed to take Mitchell to his car so that Mitchell could do the search and he could have the keys released.

FN9. Johnson was on probation at the time, with a search condition of probation.

Mitchell and Enslen drove Johnson to his car and Mitchell searched the car while Johnson watched from the patrol car. Mitchell found a black head covering with tie straps and a bag containing a door knob. Mitchell recognized the door knob as one he had seen in a bedroom at Gentry's apartment. Mitchell seized the head covering to be booked into evidence. He then took Johnson to jail. There, Johnson told Mitchell that he wanted to talk to him some more about the situation. Johnson asked how the presence of a real gun would affect the charges against him. Mitchell said that a real gun carries a significant enhancement in robbery cases. When Johnson said again that he wanted to talk, Mitchell told Johnson that he wanted Johnson to tell the truth.

After being processed, Johnson indicated that he still wanted to talk to Mitchell. Mitchell gave Johnson some paper and a pen, and told Johnson that he could write down any statement that he wished to make. Johnson then wrote out a statement and signed and dated it. Johnson wrote that he was present at, but did not participate in, the robbery. He also wrote that he struck one of the victims with a BB gun in self-defense during a scuffle outside the home. This was a possible scenario Mitchell had presented Johnson during the earlier interview.

Johnson testified that when Detective Mitchell told him that Mitchell wanted him to go to Mitchell's office to talk, he did not feel that he could tell Mitchell no. He did not have any idea why Mitchell wanted to talk to him, and neither detective told him that he was free to leave. Mitchell read him his rights but he did not understand that he had the right to have an attorney present during the questioning. Mitchell did not begin to question him about the robbery until about an hour into the interview, and he did not remember his rights at that time because he felt pressured. He continued to talk to Mitchell even after he was arrested. When Mitchell began yelling at him towards the end of the interview he felt threatened. However, at no time during the entire interview did Mitchell say or do anything that caused him to change his answers or to admit anything, and he never told Mitchell that he did not want to continue to talk to him. Johnson told Mitchell during the ride over to the car search and again during the booking process that he wanted a lawyer but he did not tell Mitchell that he did not want to talk to him anymore. He wrote out a

statement because Mitchell told him that if he did, everything would be all right and he would not have to do 10 to 50 years. The scenario in the statement was one suggested by Mitchell; he wrote down what Mitchell told him to write.

Johnson admitted that he has a prior conviction for robbery. In that case he was arrested by Officer Boyd and questioned after being informed of and acknowledging that he understood his rights. He confessed to the robbery and pleaded guilty because he was guilty. However, prior to sentencing he told the probation officer that his co-defendant actually did the robbery and he just watched.

In denying Johnson's motion to suppress his oral and written statements the trial court stated: "Detective John Mitchell is an aggressive investigating officer. The evidence before me so indicates[. He] has a distinctive style, and it runs throughout the tapes of his interviews, and I listened to all of them. He is scrupulous in making sure he reads the *Miranda* rights early on in all the interviews.... [¶¶] ... Moreover, he makes sure that the person he is interviewing answers audibly to questions, and, thus, I think goes to a good understanding of the rights. [¶¶] All the evidence supports this. The validity of *Miranda* waivers are viewed in the light of totality of circumstances. There's well-settled case law that investigating officers have wide berth in techniques and questions that can be used to elicit information. [¶¶] ... Mr. Johnson's motion this Court finds the defendant freely, voluntarily, and knowingly waived his *Miranda* rights, and that's beyond a reasonable doubt, I believe, Detective Mitchell. [¶¶] Defendant Johnson has a prior felony conviction. In that conviction he went through, he said himself on the stand, that he went through the *Miranda* rights, and he understood them. On the stand he, although he said that he plead[ed] guilty because he was guilty; however, he denied this to his probation officer in the probation report that was submitted to me. At least his credibility is suspect to put it in a charitable light. I do believe Detective Mitchell, and so I find that his *Miranda* rights were not violated, and I find that beyond a reasonable doubt in regard to Johnson. [¶¶] Also I find there was no coercion, and I think the tapes speak for themselves, and, as I indicated, I feel that Mr. Johnson's credibility is suspect."

Defendant contends that the trial court prejudicially erred in denying his motion to exclude his oral and written statements to Detective Mitchell. He argues that his statements were involuntary and were obtained in violation of *Miranda.*

"It has long been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion. [Citations.] A statement is involuntary [citation] when, among other circumstances, it 'was' 'extracted by any sort of threats . . ., [or] obtained by any direct or indirect promises, however slight. . . . [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the ''totality of [the] circumstances.'' [Citations.]" ( *People v. Neal* (2003) 31 Cal.4th 63, 79 ( *Neal* ).) "" ''Among the factors to be considered are " ''the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity'' as well as ''the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'' "" [Citation.] On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession in subject to independent review. [Citations.] In determining whether a confession was voluntary, "[t]he question is whether defendant's choice to confess was not ''essentially free'' because his will was overborne." [Citation.]' [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 411.)

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of

procedural safeguards effective to secure the privilege against self-incrimination.... Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.... The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (*Miranda, supra,* 384 U.S. at pp. 444-445.)

''[A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him'' [citations] and indeed not until counsel is actually present [citation], ''unless the accused himself initiates further communication, exchanges, or conversations with the police'' [citations]." ( *Neal, supra,* 31 Cal.4th at p. 80.) Johnson testified that he has a prior robbery conviction, and that he confessed to that robbery after being informed of and acknowledging his understanding of his *Miranda* rights. He testified that he pleaded guilty to the robbery because he was guilty, but he later denied his involvement. He further testified that when he was interrogated by Detective Mitchell after being informed of his *Miranda* rights, he did not understand that he could have an attorney present during questioning. The trial court found Johnsons credibility "suspect," and the record supports that finding.

Mitchell's interview of Johnson took place at the police station, lasted four hours, and was taped. The trial court listened to the tapes of the interview and found that Mitchell was "an aggressive investigating officer," and the record supports that finding. Mitchell repeatedly called Johnson a liar and yelled at him during the interview. However, Johnson admitted that at no time during the entire interview did Mitchell say or do anything that caused him to change his answers or to admit to anything. Johnson also admitted that he never told Mitchell that he did not want to continue to talk to him.

Johnson testified that both during the ride to the car search and during the booking process, he told Mitchell that he wanted an attorney. However, Mitchell had already concluded his interview of Johnson when these statements were made, and Johnson did not claim that he informed Johnson that he wanted to consult an attorney before speaking or have an attorney present during any subsequent interview. Johnson's request for an attorney appeared to be simply a request for appointment of counsel at the government's expense to represent him on the charges he had been arrested for. Even if we were to find that Johnson's request for an attorney was a request to have an attorney present before speaking, the record shows that Johnson himself initiated the further communication with Mitchell that resulted in his written statement. Applying the independent standard of review to this record, we conclude that Johnson's oral statements to Detective Mitchell during the interview as well as his written statement were voluntary and were not obtained in violation of *Miranda.* Accordingly, the statements were properly admitted.

Exh. C, at  11-17.


**C.  The State Court Reasonably Concluded That The Statements Were Not Taken In Violation Of *Miranda* Or Through Coercion**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that

Memorandum Of Points And Authorities - C 07-2574

a statement obtained by a police officer from a suspect during custodial interrogation may be admitted in evidence only if the officer advises the suspect of both his right to remain silent and to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer. *Id*. at 444-45. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interview must cease." *Id* 473-74. Once such a request is made, it must be "scrupulously honored" (*id.* at p. 479); the police may not attempt to circumvent the suspect's decision "by refusing to discontinue the interrogation request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Michigan v. Mosley*, 423 U.S. 96, 105-106 (1975).

A statement is involuntary only if it was actually coerced by physical or psychological mistreatment, threats of harsh consequences, or official "inducements," such as promises of leniency, benefits, or immunity from use of the statement. *Miller v. Fenton*, 474 U.S. 104, 109 (1985). The ultimate question is whether a suspect's statement is the voluntary product of a rational intellect and a free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). The voluntariness of a confession is tested on the basis of "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Stated alternatively, the test for voluntariness is whether, considering all of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. Before a statement can be deemed involuntary or coerced, coercive police activity must be shown. *Colorado v. Connelly,* 479 U.S. 167.

Prior to the AEDPA, the legal question whether a confession was voluntary was subject to independent determination by a federal court, but the underlying facts were entitled to a presumption of correctness under former 28 U.S.C. § 2254(d) (now § 2254(e)(1)). *Miller v. Fenton*, 474 U.S. 104, 112 (1985); *Collazo v. Estelle*, 940 F.2d 411, 415-16 (9th Cir. 1991) (en banc). A federal habeas court was concerned with whether the record adequately supported the state court's findings. *Aiken v. Blodgett*, 921 F.2d 214, 217 (9th Cir. 1990); *Rupe v. Wood,* 93 F.3d 1434, 1444 (9th Cir.1996) (a state court's subsidiary factual conclusions are entitled to the presumption of

1    correctness thus a federal court must defer to state appellate court's conclusion that challenged

2    statement did not constitute threat or promise).  After the AEDPA, the state court's factual findings

3    are still presumed correct, and its legal determination must be upheld unless it is contrary to, or

4    constitutes an unreasonable application of, established United States Supreme Court precedent, or

5    is based on an unreasonable factual determination.  28 U.S.C. §2254(d), (e)(1); *see Garvin v.*

6    *Farmon*, 258 F.3d 951, 957-958 (9th Cir. 2001).

7        In this case, the state courts concluded upon ample evidence that there was no *Miranda*

8    violation or coercion.  It is undisputed that Detective Mitchell read petitioner his *Miranda* rights at

9    the outset of the interview, and that petitioner did not indicate at any time that he wanted to speak

10   to a lawyer or terminate the interview.  It is irrelevant that Mitchell did not obtain an express waiver

11   of rights from petitioner; waiver is implied when, after full advisement and acknowledgment of

12   rights, a suspect freely submits to questioning.  *See People v. Whitson*, 17 Cal.4th 229, 247 (1998).

13       Petitioner nonetheless contends the detectives' interview techniques weakened his will,

14   so that he ultimately broke down as he was being booked into jail and wrote Exhibit 26.  The

15   contention fails for several reasons.  First, police officers are permitted to use some deception in

16   questioning a suspect, so long as the deception is not reasonably likely to induce an innocent person

17   to implicate himself in a crime.  *See*, e.g., *People v. Jones*, 17 Cal.4th 279, 299, 1998) (police officer

18   who implied he knew more than he did or could prove more than he could did not employ the type

19   of deception which is reasonably likely to procure an untrue statement); *People v. Thompson*,  50

20   Cal.3d 134 (1990) (police officers falsely telling defendant that they had physical evidence linking

21   him to the crime did not invalidate his confession).  Clearly,  the detectives did not violate the

22   constitution by telling Johnson that they had forensic evidence linking him to the burglary.

23       Police officers also may comment on the legal possibilities confronting a suspect,

24   including the benefits that would naturally flow from a truthful course of conduct, so long as those

25   comments do not apply unfair pressure upon the suspect.  *Amaya-Ruiz v. Stewart,* 121 F.3d 486, 494

26   (9th Cir.1997).  Nor is it coercive to recite potential penalties or sentences, including the potential

27   penalties for lying to the interviewer.  *United States v. Haswood,* 350 F.3d 1024, 1029 (9th

28   Cir.2003); *cf. United States v. Okafor,* 285 F.3d 842, 846-47 (9th Cir.), *cert. denied,* 537 U.S. 989

1    (2002) (customs agent's statements to defendant that he would be subject to 10-20 years in prison

2    and it would be to his benefit to cooperate with authorities, as well as customs agent's statement that

3    he would let the government know if defendant cooperated, did not render subsequent confession

4    involuntary). In light of these authorities, the detectives' warnings that petitioner faced a lengthy

5    prison term if convicted was not improper.  The state court had ample reason to conclude that the

6    detectives' questioning was not so coercive as to force an innocent person to falsely confess to a

7    crime.

8            More important, petitioner repeatedly acknowledged during the in limine hearing that

9    Detective Mitchell's questioning was *not* coercive.  Instead, petitioner claimed the detectives

10   became abusive *after* the recorded interview, when they allegedly twice refused his request to speak

11   to an attorney, and when Detective Mitchell dictated the text of Exhibit 26 to petitioner "word for

12   word."  RT 450-452.  Under the circumstances, the trial court's task in evaluating petitioner's

13   motion to suppress was simple – the court needed only to determine which of two conflicting

14   accounts was true.  Having listened to the entire four-hour interview tape and personally observed

15   the testimony both Mitchell and petitioner, the court announced it believed Mitchell.  That factual

16   finding is not unreasonable.  Thus, Johnson's statements should not have been suppressed.

17           Finally, assuming arguedo a coerced confession or statement was admitted, it did not have

18   a substantial or injurious effect on the verdict.  As shown above, the primary evidence in this case

19   lay in the statements of Gentry and Henderson, who directly implicated petitioner in the robbery.

20   Petitioner's written statement certainly added to this evidence, but was not in itself determinative.

21   In any event, the jury heard the entire recording of the four-hour interview, and was therefore able

22   to evaluate petitioner's explanation of the statement.  Any error in admitting the evidence as a whole

23   was harmless.

24                                              **III.**

25           **THE STATE COURT REASONABLY REJECTED PETITIONER'S
         CLAIM THAT HE WAS DENIED DUE PROCESS BY THE ADMISSION**

26           **OF EVIDENCE**

27           Petitioner contends that he was denied due process when the following evidence was

28   admitted:  1) other crimes evidence; 2) evidence that co-defendant Davis pled guilty; and 3)

Memorandum Of Points And Authorities - C 07-2574

evidence of petitioner's poverty.  We address each piece of evidence seriatim.

We first begin with the principle that evidentiary rulings do not allege a deprivation of federal rights and cannot serve as a basis for federal relief. *Engle v. Isaac*, 456 U.S. 107, 119-21 and n.21, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982); *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Jammal v. Van de Kamp*, 926 F.2d 918-19 (9th Cir. 1991).    Thus, federal habeas review does not lie to review a state court's evidentiary ruling, unless it was so prejudicial as to constitute a violation of due process. *Estelle v. McGuire,* 502 U.S. 62, 67 (1991); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993).  To obtain federal habeas relief, the petitioner must show that the admission of the evidence either infringed upon a specific federal constitutional or statutory provision applicable to the state courts, or was so prejudicial that its admission denied him his right to due process and a fair trial.  *Id.*; *Windham v. Merkle*, 163 F.3d 1092,1103 (9th Cir. 1998); *Johnson v. Sublett*, 29 63 F.3d 926, 930 (9th Cir. 1995); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993); *Butcher v. Marquez*, 758 F.2d 373, 378 (9th Cir. 1985).  The admission of evidence violates a defendant's right to due process and a fair trial only if: (1) there are no permissible inferences the jury may draw from the evidence, and (2) the evidence is of such a quality as necessarily prevents a fair trial.  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). Judged by these principles, it is clear that none of the admitted evidence violated due process.

### 1.    Other Crimes Evidence

California Evidence Code section 1101, subdivision (a), generally states that evidence of a person's character is inadmissible when offered to prove the person's conduct on a specified occasion.  Section 1101, subdivision (b), states, however, that evidence of another crime or bad act is admissible if relevant to prove a fact in issue other than character (e.g., identity, motive, intent, common design or plan, or absence of  mistake or accident).

Under California law, the admissibility of other crimes evidence under subdivision (b) depends on the materiality of the fact sought to be proved or disproved, the tendency of the other crime to prove or disprove the material fact, and the existence of any rule or policy requiring the exclusion of relevant evidence. *People v. Thompson,*  27 Cal.3d 303, 315 (1980).  To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged crimes. *People*

1    *v. Kipp,* 18 Cal.4th 349, 369-370 (1998). A lesser degree of similarity is required to establish

2    relevance on the issue of common design or plan. *Id.* at 371. The least degree of similarity is

3    required to establish relevance on the issue of intent. *People v. Ewoldt,* 7 Cal.4th 380, 402 (1994).

4    As evidence of intent, uncharged crimes need only be sufficiently similar to the charged crimes to

5    support the inference that the defendant probably harbored the same intent in each instance. *Id.* "If

6    a person acts similarly in similar situations, he probably harbors the same intent in each instance,"

7    and such prior conduct "may be relevant circumstantial evidence of the actor's most recent intent."

8    *People v. Miller*, 81 Cal.App.4th 1427, 1448 (2000); *see also People v. Nible,* 200 Cal.App.3d 838

9    (1988)(where defendant was charged with burglary after he was observed peering through the pried-

10   open screen of a woman's bedroom, the prosecutor could introduce evidence that on two other

11   occasions defendant entered women's open windows and touched the women in a sexual manner).

12          Applying these principles here, the trial court had ample grounds for admitting the

13   evidence of petitioner's 2000 robbery conviction under section 1101, subdivision (b). As previously

14   stated, petitioner initially denied any involvement in the robbery of Felix Way, but he ultimately

15   wrote a statement saying that he had been present at the time of that robbery, but that he had done

16   nothing wrong. The jury was entitled to hear that he had pleaded guilty to a robbery just two years

17   earlier, and that he had initially insisted to the police that his involvement in that crime was minimal.

18   Moreover, Boyd's testimony about his 2000 interview of petitioner – including his reference to the

19   *Miranda* warnings and petitioner's continuing claims of innocence in the face of contrary evidence

20   – was admissible to rebut the defense attorney's argument that petitioner's August 20, 2002

21   statement was coerced.

22          Thus, because there were permissible inferences which could be drawn from the evidence

23   the admission of this evidence did not deny petitioner his right to due process and a fair trial.

24   Accordingly, the state court decision was not contrary to, and did not involve an unreasonable

25   application of, clearly established United States Supreme Court precedent, and was not based on an

26   unreasonable determination of the facts in light of the evidence presented in the state appeal.

27   Federal habeas relief is therefore unwarranted. 28 U.S.C. § 2254(d).

28

1          **2.    Evidence Of Co-defendant's Mid-trial Guilty Plea**

2          Petitioner next contends that he was denied a fair trial when the jury learned in the middle

3   of trial that Jahtamari Davis had pleaded guilty to the charged crimes.  Although petitioner could

4   have prevented the jury from learning this information, he specifically requested that it be disclosed,

5   and then used it to his benefit.   Thus, as the state court found, petitioner waived any alleged error

6   by failing to object  at the time of trial and by affirmatively moving the statements in.    Thus,

7   petitioner is procedurally barred from asserting such error in this proceeding. *Wainwright v. Skyes*,

8   433 U.S. 72, 87-88 (1977); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995); *Vansickle v.*

9   *White*, 166 F.3d 953, 957-8 (9th Cir. 1999) (failure to object at trial is an adequate and independent

10  state procedural rule).

11         To avoid this conclusion, petitioner contends that his trial counsel was prejudicially

12  ineffective.  The state court rejected this conclusion. *See* Exh. C. at 17-18.  Petitioner has failed to

13  establish that its conclusion in that regard was objectively unreasonable.

14         The principles governing this species of claim is well established.  To prove that counsel

15  was ineffective, petitioner bears the burden of showing that counsel's performance fell below an

16  objective standard of reasonableness under prevailing professional norms, and that there is a

17  reasonable probability the result of the proceeding would have been different.  *Strickland v.*

18  *Washington*, 466 U.S. 668, 687-688, 695-696 (1984).  Petitioner must plead and prove both prongs

19  of this test.  *Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th Cir. 2001).  In considering the first prong

20  of the test, the reviewing court "must indulge a strong presumption that counsel's conduct falls

21  within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689.  Strategic

22  decisions by counsel are "virtually unchallengeable." *Id*. at 690.  And the Supreme Court has made

23  clear that there is no one right way for an attorney to provide effective assistance. *Strickland* at 689.

24  The Supreme Court has also  "consistently declined to impose mechanical rules on counsel." *Roe*

25  *v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  Rather, the "Federal Constitution imposes one general

26  requirement: that counsel make objectively reasonable choices."  *Id*. at 479.  Thus, "the test is not

27  whether another lawyer, with the benefit of hindsight, would have acted differently, but whether

28  'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the

Memorandum Of Points And Authorities - C 07-2574

1  defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)

2  (quoting *Strickland* at 687, 689).    "The relevant inquiry under *Strickland* is not what defense

3  counsel could have pursued, but rather whether the choices made by defense counsel were

4  reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

5        As to the second prong, a "reasonable probability" is "a probability sufficient to

6  undermine confidence in the outcome." *Id*. at 694.    In order to prevail the petitioner must

7  "affirmatively prove prejudice." *Id*. at 693.    The reviewing court need not assess counsel's

8  performance where it is clear that petitioner cannot show the requisite prejudice. *Id*. at 697;

9  *Williams v. Calderon,* 52 F.3d 1465, 1470 n. 3 (9th Cir. 1995).

10       Further, for petitioner to succeed, "he must do more than show that he would have

11  satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under section

12  2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the

13  state-court decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 698-699 (2002).

14  Rather, petitioner  must show that the state court applied *Strickland* to the facts of his case in an

15  objectively unreasonable manner. *Id*.   Thus, on federal habeas review of a claim of ineffective

16  assistance, judicial review must be "doubly deferential." *Yarborough v. Gentry*, 124 S.Ct. 1, 4

17  (2003) (per curium).

18         Petitioner cannot meet either prong.  Defense counsel obviously had tactical reasons

19  for allowing the jury to learn of Davis's guilty plea.  In closing argument counsel  acknowledged

20  that the Felix Way robbery had been committed by occupants of the Alameda Terrace Apartment,

21  but he argued that the identities of the four robbers were not certain.  Counsel  argued that three of

22  the robbers must have been Curiel, Gentry, and Henderson.  RT 1978.  Counsel  further argued that

23  the identity of the fourth robber was debatable; it could have been Davis, given that he had pleaded

24  guilty, or it could have been Larry Weaver, another apartment mate at Almaden Terrace.  RT 1983.

25  Counsel further suggested that Davis might have pleaded guilty simply because he was "a scared

26  kid that didn't think his attorney would be believed or the jury would believe it based on the

27  evidence." RT 1981.  This suggestion, of course, supported counsel's argument that petitioner had

28  written his August 20 statement because he feared his claims of innocence would be ignored.  In

1   short, counsel not only asked that the jury be told that Davis had pleaded guilty, he used that plea

2   in two ways to advance petitioner's defense.   Although those arguments were ultimately

3   unsuccessful, they were not facially unreasonable.  Thus, there was no ineffective assistance of

4   counsel.  The state court's conclusion to that effect was not objectively unreasonable.   In any event,

5   for all the same reasons advanced elsewhere in these pleadings, the admission of this evidence did

6   not have a substantial or injurious effect on the verdict.

7   **3.   Evidence Of Poverty**

8       Petitioner contends that admission of evidence that he and his codefendants needed money

9   in order to show that they had  a motive to commit robbery, denied him due process.   The state court

10  reasonably rejected this claim.

11  **a.  The State Court's Analysis Of The Claim**

12      The state court rejected petitioner's claim finding that the probative value of the evidence

13  outweighed any prejudice:

14  The evidence showed that both Henderson and Gentry told Detective Mitchell that
    Johnson, Davis, Joiner and Gentry had a bottle of cash shortly after the robberies
15  occurred, and were dividing up the cash amongst themselves. During his cross-
    examination of Gentry, the prosecutor asked him whether at the time of the robbery he
16  was about to be evicted from his apartment for failing to pay rent. Gentry responded: "I
    don't know. They said because we were too loud, but I think that rent had something to
17  do with it." Gentry also said that he and his roommates Davis and Larry Weaver had not
    yet paid that month's rent, which was $1,350, and that they were short of money. And,
18  Johnson had already been evicted from his Almaden Terrace apartment. Johnson was
    allowed to keep his things at Gentry's apartment until he could find a new place to live.

19  During closing argument, the prosecutor argued that Johnson's and other participants'
20  motives for participating in the robberies were that they needed money. The prosecutor
    pointed out portions of Mitchell's taped interview of Johnson, where Johnson stated that
21  he had recently paid off some debts. The prosecutor argued that Johnson needed money,
    and that "now all of a sudden he has money to pay" his debts even though he was being
22  evicted from his and then Gentry's apartment. None of the defendants objected to the
    prosecutor's argument.

23  Johnson contends that admission of evidence that he and his codefendants needed money
24  in order to show a motive to commit the robberies was improper and violated his right to
    a fair trial. He also argues that the prosecutor improperly relied upon the evidence in
25  closing argument and that his counsel's failure to object to the improper admission of the
    evidence constituted ineffective assistance.

26  "The issue of the relevance of evidence is left to the sound discretion of the trial court, and
27  the exercise of that discretion will not be reversed absent a showing of abuse. [Citations.]
    That discretion is only abused where there is a clear showing the trial court exceeded the
28  bounds of reason, all of the circumstances being considered. [Citations.]" (*People v.*

1    *DeJesus* (1995) 38 Cal.App .4th 1, 32.)

2    Johnson is correct that evidence of a defendant's poverty "without more" is inadmissible
to establish motive to commit robbery "because it is unfair to make poverty alone a
3    ground of suspicion...." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1024 (*Edelbacher*
).) It is also inadmissible because the probative value of poverty alone is considered
4    outweighed by the risk of prejudice. (*People v. Cornwell* (2005) 37 Cal.4th 50, 96; *People
v. Wilson* (1992) 3 Cal.4th 926, 939.) However, evidence of poverty or indebtedness may
5    be relevant and admissible in some circumstances. Thus, "the sudden possession of
money, immediately after commission of a larceny, by one who before that had been
6    impecunious, is clearly admissible as a circumstance of the case." (*People v. Kelly* (1901)
132 Cal. 430, 431-432; see also *Edelbacher, supra,* 47 Cal.3d at p. 1024.)

7
8    Here evidence of Johnson's indebtedness and his eviction from his apartment for failure
to pay rent, coupled with Gentry's eviction from the apartment they subsequently shared,
9    prior to the robberies, and Johnson's possession of cash and payment of his debts
immediately afterward, had "substantial relevance" to explain Johnson's motive for the
10   robberies and "this relevance clearly outweighed the risk of undue prejudice." (
*Edelbacher, supra,* 47 Cal.3d at p. 1024.) The trial court did not abuse its discretion in
11   admitting the evidence. And, as the evidence was properly admitted, defense counsel
cannot be faulted for any failure to object to it and the prosecutor was allowed to rely
12   upon it to establish the presence of motive. (See CALJIC No. 2.51.)

     Exh. C, at 21-23.
13
14           b.    **The State Court's Rejection Of The Claim Was Not Objectively
                   Unreasonable**

15           As the state court acknowledged, evidence of a defendant's poverty or indebtedness is

16   generally inadmissible to establish motive for robbery or theft because it is unfair to make poverty

17   alone a ground of suspicion, and the probative value of the evidence is deemed to be outweighed by

18   the risk of prejudice. Evidence of poverty or indebtedness is admissible, however, to eliminate other

19   possible explanations for a defendant's sudden wealth after a theft offense. *United States v. Jackson,*

20   882 F.2d 1444, 1449 (9th Cir.1989) (Evidence was properly admitted that the defendant was "short

21   on funds," "having financial difficulty," and borrowed money because he "couldn't pay for things

22   he needed to have done").[5/]

23   _____

24           5.  Petitioner relies on *United States v. Mitchell*, 172 F.3d 1104 (9th Cir. 1999) for the
     proposition that evidence of poverty is always improper. Petitioner misrepresents *Mitchell*. In that
25   case there was no evidence that petitioner's financial status suddenly changed. As the court noted
     there is no general rule regarding the admission of this type of evidence. One must look at the facts
26   to determine if the evidence is improperly being admitted to simply show that the defendant is poor,
     or being properly admitted as circumstantial evidence that the defendant suddenly obtained an
27   unexplainable source of income. Where the facts indicate a change in circumstance, the defendant's
     impecuniosity tends to show that the income might have been procured by illegal means. Such is
28

1    Here, the state court correctly noted that a number of witnesses mentioned that some of

2    the defendants were short of money around the time of the robbery.  Gentry had acknowledged on

3    cross-examination that he let petitioner move into Almaden Terrace apartment number 106 during

4    the summer of 2002 because petitioner had recently been evicted from unit 162 in that complex and

5    he had little money.  RT 1804-1805.  The evidence also showed that petitioner suddenly had a large

6    unexplainable source of income after the robbery occurred.  On these facts the evidence was

7    properly admitted and argued by the prosecutor as circumstantial evidence that the source of cash

8    was the robbery.

9    In any event, the admission of the evidence was clearly harmless for the reasons argued

10   throughout.  Put simply, the critical evidence lay in the lengthy detailed descriptions of the robbery

11   by petitioner's acquaintances.  Additionally, the jurors were instructed pursuant to CALJIC No. 2.51

12   that "[m]otive is not an element of the crime charged and need not be shown."  CT 335.  Finally,

13   petitioner's motive (or lack of motive) was a minor element of the prosecution case.  No prejudicial

14   constitutional error been demonstrated.

15                                          **IV.**

16   **THE FAILURE TO INSTRUCT THE JURY ON THE LAW OF
     CONSPIRACY DID NOT HAVE A SUBSTANTIAL OR INJURIOUS**

17   **EFFECT ON THE VERDICT**

18   Petitioner contends his conviction must be set aside because the trial court failed to

19   instruct the jury, sua sponte, regarding the law of conspiracy.  Although conspiracy was not charged

20   as a substantive crime against any of the defendants, the prosecutor briefly argued that Jahtmari

21   Davis's guilty plea confirmed that there was an uncharged conspiracy among the defendants to

22   commit the robbery.  As a result, petitioner contends three instructions should have been given to

23   ensure that the jury gave individualized consideration to each defendant: CALJIC No. 6.10.5

24   ("Conspiracy – Joint Responsibility"),[6] CALJIC No. 6.22 ("Conspiracy – Case Must Be Considered

25   ────────────────────────────────────────

26   the case here.

27   6.  CALJIC No. 6.10.5 reads as follows:

28         A conspiracy is an agreement between two or more persons with the specific
     intent to agree to commit the crime of _____, and with the further specific intent to

As To Each Defendant"),[7/] and 17.00 ("Several Defendants–Verdict As To Some And Disagreement As To Others").[8/]  The state appellate court found error not to have given CALJIC Nos. 6.10.5 and 17.00, regarding individualized determinations, but found the omissions to be harmless given the overwhelming evidence that the robberies were committed as a group, and the jury's differing

---

commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime, but is not charged as such in this case.

In order to find a defendant to be a member of a conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one overt act.  It is not necessary to such a finding as to any particular defendant that defendant personally committed the overt act [, if [he] [she] was one of the conspirators when the alleged overt act was committed].

The term "overt act" means any step taken or act committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a crime and which step or act is done in furtherance of the accomplishment of the object of the conspiracy.

To be an "overt act," the step taken or act committed need not, in and of itself, constitute the crime or even an attempt to commit the crime which is the ultimate object of the conspiracy.  Nor is it require that the step or act, in and of itself, be a criminal or unlawful act.

7.  CALJIC No. 6.22 reads as follows:

Each defendant in this case is individually entitled to, and must receive, your determination whether [he] [she] was a member of the alleged conspiracy.  As to each defendant you must determine whether [he] [she] was a conspirator by deciding whether [he] [she] willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy.

Before you may return a guilty verdict as to any defendant of the crime of conspiracy, you must unanimously agree and find beyond a reasonable doubt, that (1) there was a conspiracy to commit the crime[s] of _____, and (2) a defendant willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy.  You must also unanimously agree and find beyond a reasonable doubt, that an overt act was committed by one of the conspirators.  You are not required to unanimously agree as to who committed an overt act, or which overt act was committed, so long as each of you finds beyond a reasonable doubt, that one of the conspirators committed one of the acts alleged in the [information] [indictment] to be overt acts.

8.  CALJIC No. 17.00 reads as follows:

You must decide separately whether each of the defendants is guilty or not guilty.  If you cannot agree upon a verdict as to [both] [all] the defendants, but do agree upon a verdict as to any one [or more] of them, you must render a verdict as to the one [or more] as to whom you agree.

1    verdicts with respect to each defendant's participation in the crimes.

2

3    **A.    The Failure To Give The Instruction Did Not Deny Petitioner A Jury Trial Or Lower The Prosecutor's Burden Of Proof**

4        As the state court found:

5        The evidence in this case overwhelmingly showed a conspiracy to rob the occupants of the Felix Way house. The evidence showed that three men entered the Felix Way house

6    early one Friday morning, with one carrying a BB gun and another a crowbar, while leaving a fourth man outside as a lookout. The men then robbed three residents of the

7    house after shooting one with the BB gun and pistol-whipping another. Henderson told Detective Mitchell that he saw Johnson, Davis, Joiner, and Gentry shortly after the

8    robbery took place with items taken during the robbery. Gentry admitted to Detective Mitchell that he was the lookout, and further said that Johnson, Davis, and Joiner were the

9    intruders and that Johnson had the BB gun. Davis admitted to Detective Mitchell that he was one of the robbers. Johnson told Detective Mitchell that he did not rob anybody, but

10   he admitted carrying a BB gun one Friday morning and hitting somebody with it. No evidence was presented regarding any pretrial statements Joiner may have made. The jury

11   found Johnson guilty on all counts relating to the robberies and found that he personally used the BB gun. The jury also found Gentry guilty on all counts except assault with a

12   deadly weapon, but found all arming allegations not true. It was unable to reach a verdict on any count as to Joiner. Under the circumstances, it is clear that the jury ""decide[d]

13   separately whether each of the defendants [was] guilty or not guilty."" (CALJIC No. 17.00.) Therefore, it is not reasonably probable that the jury would have reached a

14   different verdict as to Johnson had it been instructed in the language of CALJIC No. 17.00. ( *People v. Watson* (1956) 46 Cal.2d 818, 836.) And, as the facts overwhelmingly

15   established Johnson's participation and role in the robberies, it is not reasonably probable that the jury would have reached a different verdict as to Johnson had it been instructed

16   in the language of CALJIC No. 6.10.5. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1231-1232.)

17

18   Exh C, at 18-21.

19   **B.    The State  Court's Conclusions Are Not Objectively Unreasonable**

20       A claim of state instructional error can be the basis of federal habeas relief only if the

21   error, considered in light of all the instructions given in addition to the trial record, "'so infected the

22   entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire,* 502 U.S. 62, 72

23   (1991) (citation omitted).  The mere fact that an instruction was allegedly incorrect under state law

24   is not a basis for habeas relief. *Id*. at 71-72.  A petitioner must show "not merely that the instruction

25   is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional]

26   right." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).  Further, "the fact that a jury

27   instruction is inadequate by Ninth Circuit direct appeal standards does not mean a petitioner who

28   relies on such an inadequacy will be entitled to habeas relief from a state court conviction." *Duckett*

Memorandum Of Points And Authorities - C 07-2574

30

1    *v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995).  Where, as here,  the alleged error stems from the

2    failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission

3    or incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson*

4    *v. Kibbe*, 431 U.S. 145, 155 (1977); *Jeffries v. Blodgett,* 5 F.3d 1180, 1195 (9th Cir. 1993).

5              Petitioner has not met his burden.  As the state court reasoned, the evidence showed

6    beyond dispute that the robbers of Felix Way had committed the crime as a group.  Although there

7    was some conflict in the various witnesses' accounts of the robbery, the two most important

8    witnesses, Gentry and Henderson, agreed that petitioner was not only actively involved in the

9    robbery, but the most aggressive participant (in that he struck Tony Aviles with the BB gun while

10   demanding his money and drugs).  The jury obviously believed this testimony, given that it

11   convicted him  of both robbery and the personal use of a BB gun.

12             Moreover, it cannot be doubted that the jury gave individualized attention to the evidence

13   against each defendant.  The jury convicted petitioner of all charges and enhancements, but acquitted

14   codefendant Gentry of assault with a deadly weapon and the arming enhancement.  Also, the jury

15   was unable to reach *any* verdict as to defendant Joiner.  On this record it is clear that the omission

16   of the these instructions were of no moment.  For the same reasons, the failure did not have a

17   substantial or injurious effect on the verdict.

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities - C 07-2574

1

**CONCLUSION**

2

Accordingly, respondent respectfully requests that the petition be denied.

3

Dated:  November 16, 2007

4

Respectfully submitted,

5

EDMUND G. BROWN JR.
Attorney General of the State of California

6

DANE R. GILLETTE
Chief Assistant Attorney General

7

GERALD A. ENGLER
Senior Assistant Attorney General

8

ROSS C. MOODY
Deputy Attorney General

9

10

11

/s/  JULIET B. HALEY
Deputy Attorney General

12

Attorneys for Respondent

13

JBH/cfl
SF2007402623
40187571.wpd

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities - C 07-2574

1

# TABLE OF CONTENTS

2                                                                          **Page**

3   STATEMENT OF THE CASE                                                   1

4   STATEMENT OF FACTS                                                      2

5   STANDARD OF REVIEW                                                      6

6   ARGUMENT                                                                7

7   I.   THE STATE COURT WAS NOT UNREASONABLE IN
         CONCLUDING THAT PETITIONER'S SIXTH AMENDMENT
8        CONFRONTATION RIGHTS WERE NOT IMPLICATED BY
         THE ADMISSION OF TESTIMONY REGARDING HIS PRIOR
9        ROBBERY CONVICTION                                                 7

10       A.   Background                                                    7

11       B.   State Court's Analysis Of The Claim                          9

12       C.   The Confrontation Clause Was Not Implicated By the Admission
              Of Boyd's Testimony                                          10
13
     II.  THE STATE COURT REASONABLY CONCLUDED
14        THAT PETITIONER'S STATEMENTS WERE PROPERLY
          OBTAINED                                                         12
15
          A.   Factual Background                                          13
16
          B.   The State Appellate Court's Analysis Of The Claim           15
17
          C.   The State Court Reasonably Concluded That The Statements Were
18             Not Taken In Violation Of *Miranda* Or Through Coercion     18

19   III.  THE STATE COURT REASONABLY REJECTED
           PETITIONER'S CLAIM THAT HE WAS DENIED DUE
20         PROCESS BY THE ADMISSION OF EVIDENCE                            21

21              1.   Other Crimes Evidence                                 22

22              2.   Evidence Of Co-defendant's Mid-trial Guilty Plea      23

23              3.   Evidence Of Poverty                                   26

24                   a.  The State Court's Analysis Of The Claim           26

25                   b.  The State Court's Rejection Of The Claim Was Not
                         Objectively Unreasonable                          27
26
     IV.  THE FAILURE TO INSTRUCT THE JURY ON THE LAW OF
27        CONSPIRACY DID NOT HAVE A SUBSTANTIAL OR
          INJURIOUS EFFECT ON THE VERDICT                                  28
28

**TABLE OF CONTENTS  (continued)**

1

Page

2

3
        A.    The Failure To Give The Instruction Did Not Deny Petitioner A Jury
              Trial Or Lower The Prosecutor's Burden Of Proof                    30

4
        B.    The State  Court's Conclusions Are Not Objectively
              Unreasonable                                                       30

5

CONCLUSION                                                                       32

A.    The Failure To Give The Instruction Did Not Deny Petitioner A Jury Trial Or Lower The Prosecutor's Burden Of Proof ........ 30
B.    The State Court's Conclusions Are Not Objectively Unreasonable ........ 30
CONCLUSION ........ 32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Aiken v. Blodgett*
921 F.2d 214 (9th Cir. 1990)                                                    19

5

*Babbitt v. Calderon*,
6    151 F.3d 1170, 1173 (9th Cir. 1998)                                           24

7    *Bell v. Cone*,
535 U.S. 685, 698-699 (2002)                                                    25

8
*Blackburn v. Alabama*,
9    361 U.S. 199, 208 (1960)                                                       19

10    *Bonin v. Calderon*,
59 F.3d 815, 842-43 (9th Cir. 1995)                                            24
11
*Brecht v. Abrahamson*
12    507 U.S. 619 (1993)                                                             6

13    *Butcher v. Marquez*,
758 F.2d 373, 378 (9th Cir. 1985)                                              22
14
*Carey v. Musladin*,
15    127 S.Ct. 649, 653-54 (2006)                                                   6

16    *Collazo v. Estelle*
940 F.2d 411 (9th Cir. 1991)                                                   19
17
*Colorado v. Connelly,*
18    479 U.S. 167                                                                   19

19    *Crawford v. Washington*
(2004) 541 U.S. 36                                                        7, 10, 11
20
*Duckett v. Godinez*,
21    67 F.3d 734, 744 (9th Cir. 1995)                                              30

22    *Early v. Packer*
537 U.S. 3 (2002) (per curiam)                                                  6
23
*Engle v. Isaac*,
24    456 U.S. 107, 119-21 and n.21,
102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982)                                      22
25
*Estelle v. McGuire,*
26    502 U.S. 62, 67 (1991)                                                        22

27    *Fry v. Pliler*,
___ U.S. ____ , 127 S.Ct. 2321                                             6, 11
28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Garvin v. Farmon*
258 F.3d 951 (9th Cir. 2001)                                                    20

*Hasan v. Galaza*,
254 F.3d 1150, 1154 (9th Cir. 2001)                                             24

*Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002)                                                    2

*Jammal v. Van de Kamp*,
926 F.2d 918-19 (9th Cir. 1991)                                                22

*Jeffries v. Blodgett*,
5 F.3d 1180, 1192 (9th Cir. 1993)                                              22

*Johnson v. Sublett*,
29 63 F.3d 926, 930 (9th Cir. 1995)                                            22

*Lockyer v. Andrade*
538 U.S. 63 (2003)                                                              6

*Michigan v. Mosley*
(1975) 423 U.S. 96                                                             19

*Miller v. Fenton*
474 U.S. 104 (1985)                                                           19

*Miller v. Fenton*,
474 U.S. 104, 109 (1985)                                                       19

*Miller-El v. Cockrell*
357 U.S. 322 (2003)                                                          6, 23

*Miranda v. Arizona*,
384 U.S. 436 (1966)                                                  12, 13, 18, 20

*People v. Corella*
(2004) 122 Cal.App.4th 461                                                     11

*People v. Ewoldt*
(1994) 7 Cal.4th 380                                                          23

*People v. Jones*
(1998) 17 Cal.4th 279                                                         20

*People v. Kipp*
(1998) 18 Cal.4th 349                                                         22

*People v. Miller*
(2000) 81 Cal.App.4th 1427                                                    23

**TABLE OF AUTHORITIES**  (continued)

**Page**

*People v. Nible*
(1988) 200 Cal.App.3d 838                                             23

*People v. Thompson*
(1980) 27 Cal.3d 303                                              20, 22

*People v. Whitson*
(1998) 17 Cal.4th 229, 247                                           20

*Roe v. Flores-Ortega*,
528 U.S. 470, 481 (2000)                                             24

*Rupe v. Wood*,
93 F.3d 1434, 1444 (9th Cir.1996)                                    19

*Schneckloth v. Bustamonte*,
412 U.S. 218, 226 (1973)                                             19

*Siripongs v. Calderon*,
133 F.3d 732, 736 (9th Cir. 1998)                                    25

*Strickland v. Washington*,
466 U.S. 668, 687-688, 695-696 (1984)                            24, 25

*United States v. Haswood*,
350 F.3d 1024, 1029 (9th Cir.2003)                                   20

*United States v. Jackson*,
882 F.2d 1444, 1449 (9th Cir.1989)                                   27

*United States v. Mitchell*,
172 F.3d 1104 (9th Cir. 1999)                                        27

*United States v. Okafor*,
285 F.3d 842, 846-47 (9th Cir.),
*cert. denied,* 537 U.S. 989 (2002)                                  20

*Vansickle v. White*,
166 F.3d 953, 957-8 (9th Cir. 1999)                                  24

*Wainwright v. Skyes*,
433 U.S. 72, 87-88 (1977)                                            24

*Walters v. Maass*,
45 F.3d 1355, 1357 (9th Cir. 1995)                                   22

*Williams v. Calderon*,
52 F.3d 1465, 1470 n. 3 (9th Cir. 1995)                              25

*Williams v. Taylor*
529 U.S. 362 (2000)                                                   6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES  (continued)**

Page

*Windham v. Merkle*,
163 F.3d 1092,1103 (9th Cir. 1998)                                    22

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam)                                         6

*Yarborough v. Gentry*,
124 S.Ct. 1, 4 (2003) (per curium)                                     25


**Statutes**


California Evidence Code,
        § 352                                                          7
        § 1101, subdivision (a)                                       22
        § 1101, subdivision (b)                                 7, 22, 23

California Penal Code


        § 213, subd. (a)(1)(A)                                         1
        § 236                                                          1
        § 237                                                          1
        § 245, subd. (a)(1)                                            1
        § 459                                                          1
        § 1101, subdivision (b)                                        8
        § 12022, subd. (a)(1)                                          1
        § 12022, subd. (b)(1)                                          1


United States Code, Title 28
        § 2254(d)                                             6, 19, 20, 25
        § 2254(e)(1)                                             2, 6, 20


**Other Authorities**

CALJIC
        No. 2.50                                                      11
        No. 2.51                                                      28
        No. 6.10.5                                                    28
        No. 6.22                                                   28, 29
        No. 17.00                                                     29

Memorandum Of Points And Authorities - C 07-2574