NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES E. JOHNSON,          )   No. C 07-02574 JF (PR)
                         )
      Petitioner,     )   ORDER DENYING PETITION FOR
                         )   WRIT OF HABEAS CORPUS
  vs.                     )
                         )
                         )
KATHY PROSPER, Warden,   )
                         )
      Respondent.    )
                         )
_____)

     Petitioner, proceeding <u>pro se</u>, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In an order to show cause issued September 17, 2007, this Court found that Petitioner had raised four cognizable claims for federal habeas relief: (1) the introduction of hearsay evidence of the victim's account of a prior robbery denied Petitioner his rights under the Sixth and Fourteenth Amendments; (2) the admission into evidence of Petitioner's oral and written statements, which were obtained in violation of <u>Miranda</u>[1] and involuntarily made, violated the Fifth and Fourteenth Amendments; (3) Petitioner was denied his Fourteenth Amendment right to a fair trial

_____
   [1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

1  by the improper admission of irrelevant and prejudicial evidence; and (4) the trial

2  court's failure to give instructions on uncharged conspiracy and on the right of each

3  defendant to a separate determination of guilt deprived Petitioner of his rights under

4  the Sixth and Fourteenth Amendments.  (Pet. at 6-7.)  Respondent filed an answer

5  addressing the merits of the petition.  Petitioner did not file a traverse, although he was

6  given the opportunity to do so.  Having reviewed the papers and the underlying record,

7  the Court concludes that Petitioner is not entitled to federal habeas corpus relief and

8  will deny the petition.

9  **FACTUAL BACKGROUND**[2]

10  ***The prosecution's case***

11  In August 2002, Jesus Aviles [footnote omitted] lived on Felix Way in San Jose with Sofia Chicas and her boyfriend Jason Monroe.

12  Chicas and Monroe sold marijuana to friends out of their bedroom. However, they had never sold marijuana to an African-American.

13  [footnote omitted]

14  On the afternoon and evening of Thursday, August 8, 2002, Chicas and Monroe had a small get-together at their home, and people were drinking and smoking marijuana there.  Later that night Joe Curiel

15  came to the home. Curiel had a drink with Chicas and Monroe and bought some marijuana.  While Curiel was there, Chris Henderson

16  [footnote omitted], an African-American, came to the house asking for Curiel. Neither Monroe nor Chicas knew Henderson, and Curiel seemed

17  surprised to see him.  Henderson was obnoxious, and he and Curiel soon left.  Chicas and Monroe went to bed around midnight.

18  Aviles arrived home around 2:30 a.m. on Friday, August 9, 2002, with his friends Shawn, Sarah, and Jamie, and parked down the street.

19  As the four of them were walking toward Aviles' home, an African-American man wearing a stocking cap and a black sweatshirt

20  came out from the bushes.  The man screamed something and ran past them.  Aviles and his friends continued on to his house and entered the

21  backyard through a gate.  The door to Aviles' room was open.  When they looked into Aviles' room, Aviles and Shawn could see people

22  inside.  Aviles told his friends to run.  Shawn and Sarah heard a noise like a gun shot coming from inside Aviles' room, and ran from the place

23  with Jamie.  The three of them hid behind a car in the driveway next door, and called for help.  After they had been there for about 10 or 15

24  minutes, they saw three men run away.  They then went back to Aviles' house, found Aviles, and waited for the police to arrive.

25  Aviles was standing outside the entrance to his room when an

26

27  [2] Relevant facts are taken from the unpublished opinion of the California Court of Appeal.  <u>See</u> <u>People v. Gentry</u>, H026381, slip op. at 3-8 (Nov. 16, 2007) (Resp't Ex.

28  C).

African-American man grabbed him and shot him on the left side of his head with a BB gun. The shot ruptured a vein causing Aviles to bleed profusely. The man then asked Aviles where "the dope"and money was, and pushed Aviles inside. Two other African-American men were inside, one with a crowbar, and all three of the intruders had their faces covered. The man who shot Aviles took him down the hall and told him to open the door to Chicas's room. Aviles yelled for Chicas to open her door, saying that a man had a gun to his head. Chicas opened the door, and the intruders ran into the room. Monroe was asleep on the bed, and one of the men pistol-whipped Monroe to wake him up.

While holding Aviles, Chicas, and Monroe at gunpoint, the three intruders asked where the money, marijuana, and the safe were. Chicas pulled a safe out from under the bed. The intruders also found a large vodka bottle containing about $2,000 to $3,000 in bills in the room. One of the intruders took Chicas out of the room to get the keys to the safe. Monroe took another intruder to the backyard where there was a broken safe. When Monroe was unable to open that safe, the intruder took Monroe back to his room. The intruders took the safe from the room, the keys Chicas gave them, the bottle of money, and a PlayStation from Aviles' room, and left.

Chicas saw the men run down Felix Way and turn right on Clara Felice. She followed them, and when she saw them start to jump a wall she returned home. On the other side of that wall is the Almaden Terrace Apartments.

Monroe and Chicas suspected that Henderson was involved in the incident. Chicas knew that Curiel was aware of the safe in her bedroom. After checking on Aviles, Chicas drove to Curiel's nearby home. She demanded that Curiel take her to Henderson's home. Curiel directed Chicas to the Almaden Terrace Apartments, and pointed to the stairs of one building that led to two apartments. Monroe waited for the police to arrive. When they did, Chicas directed the officers to the two apartments and went home. She later learned that one of the apartments was empty.

Henderson is [Petitioner]'s cousin, and Gentry, Davis and Joiner are his friends.[3] Henderson visited [Petitioner] and his friends in the summer of 2002 at an apartment in the Almaden Terrace Apartments, where he once saw a BB gun. Henderson also knows Curiel. On August 8, 2002, Henderson went with Curiel to his friend's house in order to buy some marijuana. Henderson stayed in the car when Curiel went inside. After waiting about 30 minutes, Henderson went to the house and was let inside. He and Curiel left after a few minutes and smoked the marijuana in Curiel's car. Curiel then dropped him off at the apartments, and he went inside and fell asleep. He woke up and left the next morning. Although he told Detective John Mitchell on August 22, 2002, that he woke up during the night and saw Gentry, Davis, [Petitioner] and Joiner in the room counting money, and with marijuana and a black box, [Petitioner] testified at trial that he made up the story because he was afraid that he was being identified as one of the participants in the robbery.[4]

---

[3] Gentry, Davis, and Joiner were co-defendants.

[4] Henderson testified that he was doing so under a promise from the district attorney that he would not be prosecuted for lying to the police, but that he could be prosecuted

Detective Mitchell interviewed Gentry on August 16, 2002. After waiving his Miranda rights [citation omitted], Gentry said that he had been in the car with Henderson and Curiel when they went to the Felix Way home on August 8, 2002, to buy marijuana. He waited in the car with Henderson when Curiel went inside. At some point, Henderson also went inside the home, and came back with Curiel and marijuana. A plan was entered into at Gentry's apartment to rob the Felix Way home. Gentry said that a BB gun and a crowbar were used in the robbery. Henderson was not involved in the robbery. Gentry acted as the lookout and did not go inside the home. When some people came home during the robbery, Gentry called out a warning and ran back to his apartment. Gentry said that his cut from the robbery was $250. Mitchell found a crowbar in Gentry's Almaden Terrace apartment under his bed, where Gentry told him it would be. Mitchell also found a box of BBs in the apartment.

Detective Mitchell interviewed Davis on October 9, 2002. After waiving his Miranda rights, Davis admitted being involved in the robbery but said that Henderson was not involved in the robbery.

Detective Mitchell and Officer Jeffrey Enslen interviewed [Petitioner] at the police station for four hours on August 20, 2002. The interview was tape recorded, and the tapes were played for the jury. During the interview, Mitchell did not make any threats or promises that caused [Petitioner] to admit anything. [Petitioner] was arrested and the officers then took him to his car. Mitchell searched the car and found a doorknob inside a bag and a head cover that could also be used as a mask. Mitchell had earlier seen the doorknob in Gentry's apartment. [Petitioner] was taken to jail and booked. [Petitioner] then said that he wanted to talk some more about the case. He wrote out a statement, which was admitted into evidence as People's Exhibit 26. In the statement [Petitioner] admitted being at a house early one Friday morning when some of the people he was with went inside. He stayed outside and ended up hitting a man with a BB gun during a scuffle, but he did not rob anybody or take any marijuana.

San Jose Police Officer Patrick Boyd interviewed [Petitioner] in April 2000. At the time, [Petitioner] was a suspect in a robbery that had occurred the previous month. Boyd informed defendant of his Miranda rights and [Petitioner] acknowledged understanding his rights. [Petitioner] said that he drove with two other individuals to a bank at Valley Fair and parked a little distance away. He and one of the other individuals went up to a man at the ATM who was carrying a deposit bag. The individual with [Petitioner] threatened the man, demanded the bag, and got into a scuffle with the man, who was knocked to the ground. [Petitioner] said that he did not actually participate in the assault. When Boyd told [Petitioner] that this was contrary to what the victim indicated, [Petitioner] continued to deny any physical involvement, but acknowledged that he was there and that he knew that the robbery was going to occur. He also said that the money in the deposit bag was divided amongst the three of them in the car. A certified copy of [Petitioner]'s conviction for robbery as a result of this incident was admitted into evidence as People's Exhibit 8.

---

if he admitted being involved in the robbery. [original footnote renumbered.]

1

### The defense case

2

Gentry testified that on the evening of August 8, 2002, he went with Curiel and Henderson to the Felix Way house to buy some marijuana. Curiel went inside and Gentry and Henderson waited in the car. Some time later, Henderson went inside and came back with Curiel. They all went and smoked some marijuana in the car. Curiel left and Gentry and Henderson then smoked some more marijuana at Gentry's Almaden Terrace apartment with Davis. Later that night, while Henderson was sleeping on the couch, [Petitioner] and Joiner came to the apartment. Gentry went with Davis, [Petitioner] and Joiner when they walked over to the Felix Way residence. There, Davis said that they were going to rob it. He told Gentry to stay outside as a lookout, and the others went inside. Davis had a crowbar and [Petitioner] had a BB gun. When Gentry heard some people coming, he shouted a warning and ran home. The others came back to the apartment with a black box, a bottle full of money, and a PlayStation. They broke the bottle, counted the money, and gave him about $100. He did not take more because he did not want to be involved. While they were still counting the money, Gentry heard Curiel's and Chicas's voices coming from outside near [Petitioner]'s former apartment. Then he saw the police arrive. Davis, [Petitioner] and Joiner turned off the lights in the apartment. Henderson woke up while Davis, [Petitioner] and Joiner ran around and hid the things that had been taken in the robbery.

Gentry further testified that [Petitioner], Davis and Joiner had been planning the robbery for a week or two. Curiel had told them that his "weed hookup" had "all this weed and all this stuff," including a lot of money. Gentry also heard [Petitioner], Davis and Joiner later talk about finding a pistol and a pound of marijuana in the black box. Detective Mitchell did not believe Gentry when he said during his August 16, 2002 interview that he never went inside the house and that Joiner was the third person involved in the robbery who did go inside.

### Verdicts, findings on prior allegations, and sentencing

In the middle of trial, Davis entered into a negotiated plea agreement, a condition of which was a three-year prison sentence. Outside the presence of the jury, [Petitioner] waived jury trial on the prior allegation. The jury found [Petitioner] guilty of all charges, counts 1 through 8, and found true allegations that he personally used a deadly and dangerous weapon during the commission of counts 1 through 7. The jury found Gentry guilty of counts 1 through 7, but found him not guilty of count 8 and found all arming allegations as to him not true. The jury was unable to reach a verdict on any counts as to Joiner, and the court declared a mistrial as to him. The court found true the allegation that [Petitioner] had a prior robbery conviction that qualified as a strike. The court sentenced [Petitioner] to 21 years in state prison. The court suspended imposition of sentence as to Gentry and placed him on three years probation with various terms and conditions, one of which was that he not "go to places where illegal drugs are used or sold or alcohol is the chief item of sale."[5]

---

[5] At the sentencing hearing the prosecutor stated that all of the jurors had approached him after trial and requested leniency for Gentry, and that two jurors had

# DISCUSSION

## A.   <u>Standard of Review</u>

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or an involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u>  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 411.

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  <u>Id.</u> at 409.  The "objectively unreasonable" standard does not equate to "clear error"  because "[t]hese two standards . . . are not the same.  The

---

written letters on Gentry's behalf. [original footnote renumbered.]

gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B.    Analysis of Legal Claims**

1.    <u>Introduction of Hearsay Evidence of Prior Robbery</u>

Petitioner claims that admission of evidence of his prior robbery conviction violated his rights under the Sixth Amendment's Confrontation Clause pursuant to <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), as well as his Fourteenth Amendment rights. (Pet. Attach. A. at 1.) The state trial court allowed the prosecution to introduce evidence of Petitioner's prior conviction for a 2000 ATM robbery as evidence of Petitioner's intent to commit the 2002 Felix Way robbery.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. Amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. <u>Pointer v. Texas</u>, 380 U.S. 400, 403 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. <u>Crawford</u>, 541 U.S. at 61 (2004). It commands not that evidence be reliable but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. <u>Id.</u>; <u>see</u> <u>Davis v. Alaska</u>, 415 U.S. 308, 315-16 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination).

The Confrontation Clause applies to all "testimonial" statements. <u>Crawford,</u>

541 at 51-61.  "Testimony... is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Id. at 51 (citations and quotation marks omitted); see id. ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").  The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence.  Id. at 50-51.  Out-of-court statements constitute hearsay when offered in evidence to prove the truth of the matter asserted.  Anderson v. United States, 417 U.S. 211, 219 (1974).

While the Confrontation Clause does not necessarily bar the admission of hearsay statements, it may prohibit introducing evidence that otherwise would be admissible under a hearsay exception.  Idaho v. Wright, 497 U.S. 805, 813, 814 (1990); Lilly v. Virginia, 527 U.S. 116, 139-40 (1999) (plurality) (admission of accomplice's hearsay confession to police inculpating defendant violated Confrontation Clause); id. at 143 (Scalia, J., concurring) (same).  The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay."  See Crawford, 541 U.S. at 51.  The Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.  Id. at 59 n.9.

While the Supreme Court has not articulated a comprehensive definition of testimonial hearsay, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  Id. at 68.  See, e.g., United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005) (statements to law enforcement officers); Bockting v. Bayer, 399 F.3d 1010, 1011(9th Cir.), amended,  408 F.3d 1127 (9th Cir. 2005), rev'd on other grounds sub nom., Whorton v. Bockting, 549 U.S. 406 (2007) (statements made by child-victim in interview with police were testimonial hearsay governed by Crawford).   Crawford applies only to "testimonial statements offered for the truth of the matter asserted."

541 U.S. at 36.  Where the Supreme Court has never squarely addressed whether a particular type of statement is testimonial, a state court's admission of such a statement at trial as non-testimonial is not "contrary to" clearly established Supreme Court precedent or an "unreasonable application" of Crawford, under 28 U.S.C. § 2254(d)(1). See Davis v. Washington, 547 U.S. 813 (2006); see Crawford, 541 U.S. at 36 (U.S. Supreme Court noting that with regard to non-testimonial hearsay "...it is wholly consistent with the Framer's design to afford the states flexibility in their development of hearsay law").  Where non-testimonial hearsay is at issue, the states may develop evidentiary rules for its admissibility, including exemption of such statements from Confrontation Clause scrutiny altogether.  Id. at 68.

Confrontation Clause claims are subject to harmless error analysis.  United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case); see also Allen, 425 F.3d (9th Cir. 2005).  For purposes of federal habeas corpus review under 28 U.S.C. § 2254, this means that relief should be granted only if the admission at issue "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  If the state court disposed of a constitutional error as harmless under an appropriate standard of review, federal courts must, for purposes of application of the "unreasonable application" clause of § 2254(d)(1), first determine whether the state court's harmless error analysis was objectively unreasonable.  Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004).  If the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the Brecht analysis.  Id. at 877.  Analysis under the "contrary to" clause of § 2254(d)(1) is not affected by this rule.  Id.  The standard on direct review of federal criminal convictions is "harmless beyond a reasonable doubt."  Nielsen, 371 F.3d at 581.

Prior to trial, defense counsel moved, pursuant to Cal. Evid. Code § 352, to exclude evidence of Petitioner's prior felony conviction for an ATM robbery in 2000.

1    (Reporter's Transcript ("RT") at 6) (Resp't Ex. B).  In opposition, the prosecutor

2    argued that the similarities between the ATM and Felix Way robberies warranted

3    admission of the ATM robbery to establish Petitioner's identity as one of the Felix

4    Way robbers, and to prove Petitioner's intent under Cal. Evid. Code § 1101 (b). (RT at

5    602-05, 641-45.)  Specifically, he argued that both cases involved multiple attackers,

6    the attacks seemed to have been planned in advance, the victims were struck in the

7    head, and large amounts of money were taken.  (Id. at 602-03.)  The prosecutor also

8    stressed that, after the Felix Way robbery, Petitioner gave police the same excuse he

9    had given them after the ATM robbery two years earlier:  that he had been present

10   when the crime occurred but was not actively involved in its commission.  The trial

11   court found the conviction admissible only on the issue of intent.  (Id. at 10-11, 606,

12   645).

13         At trial, San Jose Police Officer Patrick Boyd testified that he had interviewed

14   Petitioner about the ATM robbery a few weeks after the crime took place.  (Id. at

15   1376-82.)  According to Boyd, Petitioner admitted he had driven with some friends to a

16   local Bank of America with the intent to commit a robbery, but he denied having taken

17   part in the actual robbery.  (Id. at 1380-82.)  Boyd told Petitioner that the victim had

18   reported being assaulted by two men, but Petitioner continued to deny that he had an

19   active role in the assault and robbery.  (Id. at 1382.)

20         In his appeal to the state appellate court, Petitioner contended that Detective

21   Boyd's testimony about the victim's account of the prior robbery was inadmissible

22   hearsay, and that admission of the testimony denied him his rights under the Sixth and

23   Fourteenth Amendments.   Reviewing the trial court's decision for Crawford error, the

24   state appellate court found that "[t]his portion of Boyd's testimony was not hearsay as

25   it was not offered to prove that [Petitioner] was indeed part of the actual assault on the

26   victim, but was offered to prove that [Petitioner] denied being part of the actual assault

27   even when confronted with a contrary claim by the victim.  As Boyd's testimony

28   regarding the content of the victim's statements was not offered to prove the truth of

the matter stated, no <u>Crawford</u> error is shown... " (Resp't Ex. C at 11.)

Petitioner claims that the state appellate court misapplied <u>Crawford</u>, for "the testimony of Detective Boyd about what the victim said occurred [was] introduced for [its] truth without [Petitioner]'s having an opportunity to cross examine [it], and [thus] violated his Sixth Amendment rights." (Pet. Attach. A at 1.) Petitioner claims that <u>Crawford</u>'s guarantee of the right to cross-examination for testimonial statements, although "not defined precisely, clearly fits the statements at issue herein as the victim was talking to police in anticipation of criminal prosecution." (<u>Id.</u> at 3, citing <u>Crawford</u>, 541 U.S. at 50-51.)

Although <u>Crawford</u> does cite "statements made during police investigations" as an example of statements that are "testimonial" in nature, 541 U.S. at 51-52, the Supreme Court since has specified that not all statements made to police prior to trial are testimonial. <u>See</u> <u>Davis</u>, 547 U.S. at 821-3l. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." <u>Id.</u> "[Statements] are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." <u>Id.</u> As Respondent correctly notes, the record does not indicate the context in which the victim's statements were made to Boyd. (Resp't at 11.) Without more evidence of the circumstances existing at the time the statements were made, it is unclear whether Boyd's reference to victim's statements regarding the ATM robbery constituted testimonial evidence. <u>See</u> <u>Crawford</u>, 541 U.S. at 50-51.

However, even assuming that the statements were testimonial, <u>Crawford</u> only would preclude their introduction if they were offered to prove the truth of the matter asserted. (Resp't Ex. C at 10-11.) As noted above, the state appellate court held that Boyd's reference to the victim's statement did not violate <u>Crawford</u> because the evidence was offered not to show that Petitioner actually took part in the assault on the

victim but rather to show the circumstances under which Petitioner denied having been an active participant in a robbery even when confronted by the victim's contrary claim. (Id. at 11.)

Petitioner claims that the state appellate court erred in holding that evidence of the victim's statements should only be excluded if offered to show Petitioner's actual involvement in the robbery.  He argues that the appellate court's holding "fails to consider the fact that [Petitioner]'s credibility and his intent as to which his statement was offered... could only be relevant if the jury believed that truth of the victim's statement." (Pet. Attach. A at 1-2.)  He contends that, because testimony of the victim's account of the ATM robbery only could have been relevant as to the issue of intent if the jury believed the truth of those statements, Crawford compelled exclusion of the testimonial evidence unless its validity were tested by cross-examination.  (Id. at 2.)

Petitioner overreads Crawford.  The state appellate court was correct in finding that the evidence of the victim's statement was offered not to establish that Petitioner actually took part in the ATM robbery but rather to show that Petitioner had maintained his claims of innocence in spite of the victim's allegations that Petitioner had been involved.  Contrary to Petitioner's claims, the jury did not have to believe the truth of the victim's statement that Petitioner was one of the attackers.  Rather, the jury only had to recognize that Petitioner did not alter his story despite being alerted to a discrepancy between his version of events and that of the victim.  Because the evidence of the victim's statement was not offered to prove the truth of the matter asserted within those statements, the Court rejects Petitioner's claim that the evidence in question was testimonial in nature.

Even if Petitioner's right to confrontation was violated, to prevail on habeas review he would have to show that the erroneous admission of evidence had a substantial and injurious effect on the verdict.  Brecht, 507 U.S. at 623.  Pursuant to CALJIC No. 250, the trial court instructed the jury to consider the evidence of

Petitioner's prior crimes only for the limited purpose of determining whether it established that he had the requisite intent to have committed the charged crime. (Clerk's Transcript ("CT") at 332) (Resp't Ex. A1).  As Respondent notes, the prosecution's case rested primarily on the comprehensive and convincing statements of Gentry and Henderson, both of whom stated that Petitioner was an active participant in the Felix Way robbery.  (Resp't at 11.)  Gentry and Henderson reported that one of the robbers had struck a victim in the head with a BB gun, and that the robbers stole such items as a liquor bottle and a strong box filled with cash, marijuana, and a handgun. (RT at 1617-19.)  In his guilty plea, Davis confirmed Gentry's and Henderson's version of the events.  Additionally, Petitioner and his friends matched the general descriptions of the robbers, who were seen running from the crime scene toward Almaden Terrace Apartments where Petitioner and his friends lived.  Given that the weight of the evidence clearly implicated Petitioner in the Felix Way robbery, the trial court's admission of statements made by the victim of the ATM robbery did not have a substantial or injurious effect on the jury's verdict.  See Brecht, 507 U.S. at 623. Accordingly, the state court's decision to reject Petitioner's claim was not contrary to or an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d).

> 2.     Admission of Oral and Written Statements
>
> > a.     Miranda Violation

Petitioner claims that the admission into evidence of his own oral and written statements, which allegedly were obtained in violation of Miranda, deprived him of his Fifth Amendment rights.  (Pet. Attach. B at 1.)  The trial court denied Petitioner's motion to suppress these statements.  The state appellate court affirmed, concluding that Petitioner's oral and written statements were voluntarily made and not obtained in violation of Miranda.  (Resp't Ex. C at 16-17.)

In Miranda, 384 U.S. 436, the Supreme Court held  that certain warnings must be given before a suspect's statement made during custodial interrogation can be

admitted as evidence.  <u>Miranda</u> announced a constitutional rule that cannot be superseded legislatively.  <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 431-32 (2000). <u>Miranda</u> and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts.  <u>See</u> <u>id.</u> at 443-45.  <u>Miranda</u> is "clearly established law" for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d)(1).  <u>See</u> <u>Jackson v. Giurbino</u>, 364 F.3d 1002, 1009 (9th Cir. 2004).

<u>Miranda</u> requires that a person subjected to custodial interrogation be advised that he has the right to remain silent, that his statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed.  384 U.S. at 444.  These warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.  <u>Id.</u> at 444-45. "[I]nterrogation means questioning or 'its functional equivalent' including 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  <u>Pope v. Zenon</u>, 69 F.3d 1018, 1023 (9th Cir. 1995) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)).

Once properly advised of his rights, an accused may waive them voluntarily, knowingly, and intelligently.  <u>See</u> <u>Miranda</u>, 384 U.S. at 475.  The distinction between a claim that a <u>Miranda</u> waiver was not voluntary and a claim that such waiver was not knowing and intelligent is important.  <u>Cox v. Del Papa</u>, 542 F.3d 669, 675 (9th Cir. 2008).  The cognitive component depends upon the defendant's mental capacity, while the voluntariness component turns on the absence of police overreaching.  <u>Id.</u>

A valid waiver of <u>Miranda</u> rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant.  <u>See</u> <u>United States v. Bernard S.</u>, 795 F.2d 749, 751 (9th Cir. 1986).  To satisfy the requirement that a waiver is knowing and intelligent, the government must introduce sufficient evidence to establish that under the totality of the circumstances, the defendant was aware of

"the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).  A showing that the defendant knew his rights generally is sufficient to establish that he knowingly and intelligently waived them.  See, e.g., Sechrest v. Ignacio, 549 F.3d 789, 805-06 (9th Cir. 2008).

Although the burden is on the government to prove voluntariness, a Miranda waiver cannot be held involuntary absent official compulsion or coercion.  See Colorado v. Connelly, 479 U.S. 157, 170 (1986).  Encouraging a suspect to tell the truth is not coercion.  Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997).  Nor is it coercive to recite potential penalties or sentences, including the potential penalties for lying to the interviewer.  United States v. Haswood, 350 F.3d 1024, 1029 (9th Cir. 2003).  However, a confession is rendered involuntary "having been extracted as the result of a promise of leniency made by the interrogating officers." Moore v. Czerniak, 534 F.3d 1128, 1138-39 (9th Cir. 2008).

At the hearing on Petitioner's motion to suppress his oral and written statements, Detective Mitchell testified that on August 20, 2002, he and Detective Enslen contacted Petitioner at work and asked if he would go with them to the police station.  (RT at 25-26.)  Petitioner consented and accompanied the detectives to the police department, where the detectives conducted a four-hour tape-recorded interview of Petitioner.  (Id. at 26-28.)

Near the beginning of the interview, the detectives read Petitioner his Miranda rights and confirmed that he understood them.  (Id. at 29-30.)  Petitioner did not indicate any desire to exercise his rights or to stop the interview.  (Id. at 30.)  The detectives then employed a series of tactics to get Petitioner to confess.  They told Petitioner that multiple witnesses had identified him as a participant in the robbery.  (Id. at 289.)  They said that they had obtained DNA and fingerprint evidence to prove that Petitioner had been at the crime scene.  (Id. at 284.)  They told Petitioner that he could receive an enhanced sentence of up to fifty years in prison if he had used a real

gun during the robbery.  (Id. at 278.)  They placed defendant under arrest about an hour before the interview was over.  (Id. at 31.)  Despite these aggressive tactics, Petitioner maintained that he had not been present at the time of the robbery.  (Id. at 30.)

When the interview ended, the detectives drove Petitioner to his car, which the detectives then searched with Petitioner's consent.  (Id. at 31-35.)  Along with a black silk head covering, the detectives found a bag containing a doorknob, which Detective Mitchell recognized as a doorknob from a bedroom in Apartment Number 106 of Canoas Garden Apartments, a suspect room linked to Petitioner where Mitchell had previously had found a crowbar and a box of BB's.  (Id. at 36, 445.)  They then drove Petitioner to the county jail for booking.  (Id. at 38.)  While there, Petitioner began asking Mitchell questions and indicated that he wanted to recommence their discussion of the case.  (Id. at 39-41.)  The detectives gave Petitioner a pen and paper and told him he could write a statement about the incident.  (Id. at 41.)  Petitioner then went into a room by himself and wrote a statement which was admitted at trial as  "Exhibit 26." (Id.)

Petitioner testified that when Detective Mitchell contacted him and requested that he go to Mitchell's office to discuss the case, he did not believe he could refuse. (Id. at 306.)  He did not know why the detectives wanted to talk and neither officer informed him that he was free to leave.  (Id. at 307.)  Petitioner acknowledged they advised him of his Miranda rights at the beginning of the interview, but Petitioner nonetheless was unaware that he had a right to have an attorney present at that moment. (Id. at 310.)  He testified that he had forgotten his rights an hour later, which is about the time when he realized he was being treated as a suspect.  (Id. at 312.)  Although Petitioner felt threatened by Mitchell's yelling and his claims of having conclusive proof of Petitioner's guilt, none of Mitchell's threats or promises caused Petitioner to confess to anything, and Petitioner never told Mitchell that he did not want to continue their conversation.  (Id. at 313-18, 434.)

///

1    Following this interview, Petitioner told Mitchell twice that he wanted a lawyer,

2    once during the ride over to the car search and again during booking at the police

3    station.  (Id. at 438-39.)  Afterwards, Petitioner wrote his statement because Mitchell

4    told him that if he did, Petitioner could make his involvement seem less severe, which

5    would allow him to escape a long sentence.  (Id. at 450.)  When Petitioner drafted his

6    written statement, he claims he based it on a scenario suggested to him by Mitchell.

7    (Id. at 323-26, 480-89.)

8    Petitioner claims that his written and oral statements should have been

9    suppressed because Detective Mitchell violated Petitioner's Miranda rights by

10   intentionally failing to ask for a Miranda waiver prior to the interrogation and by

11   denying Petitioner's request for a lawyer.  He also claims in his petition that the

12   interrogating officers used impermissible interrogation techniques by (1) threatening

13   him with a fifty year sentence, (2) handcuffing him then promising to remove the

14   handcuffs if he confessed, and (3) lying about having implicating evidence such as

15   DNA samples and the testimony of six witnesses, which ultimately "created a coercive

16   atmosphere [such that] [Petitioner]'s written statement was the product of having his

17   will overborne." (Pet. Attach. B at 2, 6.).

18   The trial court denied Petitioner's motion to suppress the statements, finding

19   that:  "Detective John Mitchell is an aggressive investigating officer...  He is

20   scrupulous in making sure he reads the Miranda rights early on in interviews.

21   Moreover, he makes sure that the person he is interviewing answers audibly to

22   questions, and thus, I think goes to a good understanding of the rights."  (RT at 514.)

23   The trial court found it relevant that in Petitioner's prior felony conviction, Petitioner

24   said on the stand that he had been informed of and understood his Miranda rights.

25   (Id.).  The trial court concluded that the statements Petitioner made to Detective

26   Mitchell on August 20, 2002 were not obtained in violation of Miranda, finding that

27   Petitioner "freely, voluntarily, and knowingly waived his Miranda rights."  (Id.)  The

28   court also found no evidence of coercion, concluding after an examination of the taped

1   recordings of the interrogations that the tapes "speak for themselves" as to the

2   voluntariness of Petitioner's statements.  (Id. at 515.)

3        The state appellate court affirmed.  The appellate court cited Petitioner's

4   admission that at no time during his interview did Mitchell say or do anything that

5   caused him to change his answers or to admit to anything, indicating that there was no

6   coercion.  (Resp't Ex. C at 16.)  The court also found meritless Petitioner's contention

7   that the written statement was obtained in violation of Miranda, noting that although

8   Petitioner requested a lawyer before giving his written statement, because Petitioner

9   had been the one to initiate the further communication with Mitchell that resulted in his

10  writing of the statement, there was no Miranda violation.  (Id. at 18.)

11       The Court finds that Petitioner's oral and written statements were not obtained

12  in violation of Miranda.   Prior to obtaining the oral statements, Officer Mitchell read

13  Petitioner his Miranda rights, and Petitioner never made any indication that he wished

14  to speak to a lawyer or end the interview.  (Id. at 29-30.)  Detective Mitchell did not

15  have to explicitly request a waiver of rights, as one may be implied when, after full

16  advisement and acknowledgment of rights, a suspect freely submits to questioning.  See

17  United States v. Rodriguez-Lopez, 63 F.3d 892, 893 (9th Cir. 1995) (no Miranda

18  violation where defendant volunteered statement after he was apprised of Miranda

19  rights and said he understood those rights).  The record supports the finding that

20  Petitioner's oral statements to Mitchell were not taken in violation of Miranda.

21       With regard to the written statement, as the state appellate court noted, Mitchell

22  had already finished his interrogations when Petitioner initiated the communications

23  that led to his written statement.  (RT at 39-41)  Because Petitioner was the one to

24  initiate this second round of communications, Petitioner's prior invocation of his right

25  to counsel did not bar Mitchell from asking further questions.  See Oregon v.

26  Bradshaw, 462 U.S. 1039, 1045-46 (1983).  Under these circumstances, the record

27  sufficiently supports the state courts' finding that the written statement was not

28  obtained in violation of Miranda.

1

b.      Involuntary Confession

2      Petitioner also contends that he did not write his statement voluntarily, claiming

3   that the interrogating officers used impermissible interrogation techniques and

4   ultimately "created a coercive atmosphere [such that] [Petitioner]'s written statement

5   was the product of having his will overborne by this conduct."  (Pet. Attach. B at 2);

6   see supra at 16-17.  He also claims that such factors as his lack of criminal

7   sophistication, his young age, Detective Mitchell's use of threats and promises of

8   leniency, and the fact that his written statement was based on what Detective Mitchell

9   told him to write, viewed as a whole, attest to the coercive nature of the circumstances

10   from which the statement emerged.  (Pet. Attach. B at 8-9.)

11      Involuntary confessions in state criminal cases are inadmissible under the

12   Fourteenth Amendment.  Blackburn v. Alabama, 361 U.S. 199, 207 (1960).  The

13   voluntariness of a confession is evaluated by reviewing both the police conduct in

14   extracting the statements and the effect of that conduct on the suspect.  Miller v.

15   Fenton, 474 U.S. 104, 116 (1985); Henry v. Kernan, 197 F.3d 1021, 1026 (9th Cir.

16   1999).  A confession is involuntary only if the police use coercive activity to

17   undermine the suspect's ability to exercise his free will.  Derrick v. Peterson, 924 F.2d

18   813, 818 (9th Cir. 1990).  Absent police misconduct causally related to the confession,

19   there is no basis for concluding that a confession was taken in violation of the

20   Fourteenth Amendment.  Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("Coercive

21   police activity is a necessary predicate to the finding that a confession is not

22   'voluntary' within the meaning of the Due Process Clause of the Fourteenth

23   Amendment").

24      In addition to evaluating the propriety of police interrogation techniques, a court

25   reviewing the merits of a claim of coercion must consider the effect that the totality of

26   the circumstances had upon the will of the petitioner.  See Schneckloth v. Bustamonte,

27   412 U.S. 218, 226 (1973).  "The test is whether, considering the totality of the

28   circumstances, the government obtained the statement by physical or psychological

coercion or by improper inducement so that the suspect's will was overborne." <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988).

After examining the record of the interrogation and the resulting confession, the Court concludes that the police officers' conduct was not sufficiently "coercive" to render the confession involuntary.  Viewed as a whole, the "totality of the circumstances" do not indicate that Petitioner's confession was produced by "physical or psychological coercion or by improper inducement" such that Petitioner's will was overborne.  <u>See</u> <u>Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988).

Petitioner's first contention that the detectives' claims of having DNA evidence and witness testimony implicating Petitioner in the crime amounted to impermissible coercion is without merit.  The use of deceptive interrogation techniques does not by itself render a confession involuntary.  <u>See</u> <u>United States v. Miller</u>, 984 F.2d 1028, 1031 (9th Cir. 1993).  Nothing in the record indicates that Petitioner's "will was overborne" such that his confession was not "the product of a rational intellect and a free will."  <u>See</u> <u>Schneckloth</u>, 412 U.S. at 226 (1973); <u>see also</u> <u>United States v. Tingle</u>, 658 F.2d 1332, 1335 (9th Cir.1981).  Petitioner stated at trial that he did not admit any involvement in the robbery upon being told during interrogation that the police had forensic evidence linking him to the crime scene as well as statements by witnesses who had identified him as one of the robbers, which suggests that this tactic did not deprive Petitioner of his capacity make a "free and unconstrained choice" in deciding to confess.  <u>See</u> <u>Henry</u>, 197 F.3d at 1026-27.  As it is not inherently coercive for the police to make deceptive statements, and given the absence of evidence that Petitioner was at any point deprived of his capacity to exercise his free will, the detectives' claims of having compelling condemnatory evidence does not stand as a sufficient basis for finding that Petitioner's confession was involuntary.  <u>See</u> <u>Miller</u>, 984 F.2d at 1031.

The Court also rejects Petitioner's claim that the officers made impermissible threats or promises of leniency.  The detectives were permitted to advise Petitioner of the potential penalties he would face if convicted.  <u>See</u> <u>Haswood</u>, 350 F.3d at 1029.  It

1    was not improper for the detectives to warn Petitioner that he could be subject to a

2    heightened sentence if he did not cooperate.  See id.

3         Petitioner's contention that his personal characteristics made him especially

4    susceptible to coercion is irrelevant.  Specifically, Petitioner claims that the detectives

5    exploited his youth and lack of criminal sophistication in eliciting his confession.

6    However, because Petitioner has not established that the detectives' tactics were

7    inherently coercive, his age and lack of sophistication with the law have no bearing on

8    this claim.  See Derrick v. Peterson, 924 F.2d 813, 818 (9th Cir. 1990) (holding

9    personal characteristics of the defendant to be irrelevant absent proof of coercion).

10        Accordingly, the state court's rejection of this claim was not contrary to or an

11   unreasonable application of federal law, nor was it based on an unreasonable

12   determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d).

13            3.    Improper Admission of Evidence

14        Petitioner next claims that he was denied his Fourteenth Amendment due

15   process rights when the trial court admitted the following evidence:  a) other crimes

16   evidence; b) evidence of co-defendant Davis' guilty plea; and c) evidence of

17   Petitioner's poverty.  (Pet. Attach. C at 1.)  The Court addresses each item separately.

18        The admission of evidence is not subject to federal habeas review unless a

19   specific constitutional guarantee is violated or the error is of such magnitude that the

20   result is a denial of the fundamentally fair trial guaranteed by due process.  See Henry

21   v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990

22   (9th Cir. 1986).  The Supreme Court "has not yet made a clear ruling that admission of

23   irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient

24   to warrant issuance of the writ."  Holley v. Yarborough, No. 08-15104, slip op. 7157,

25   7172 (9th Cir. June 16, 2009).

26            a.    Other Crimes Evidence

27        Petitioner claims the trial court erred in permitting the prosecution to introduce

28   evidence of his prior robbery conviction.  (Pet. Attach. C at 1.)  He contends that this

evidence should have been excluded because it fails to meet California's statutory criteria for admission as evidence of intent.  (Id.)  As discussed previously, see supra at 9-10, the state trial court found the circumstances of the prior robbery sufficiently similar to the Felix Way robbery for the evidence to be admitted to show intent under California Evidence Code section 1101(b).  (RT at 602-03.)  The state appellate court affirmed, finding that the trial court did not abuse its discretion in admitting the evidence to prove intent.

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  See Henry, 197 F.3d at 1031; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.  See id. (citing Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley, 784 F.2d at 990.

The admission of other crimes evidence violates due process only where there are no permissible inferences the jury can draw from the evidence (in other words, no inference other than conduct in conformity therewith).  See McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir. 1993); Jammal, 926 F.2d at 920.  The admission of other crimes evidence is generally upheld where: (1) there is sufficient proof that the defendant committed the prior act; (2) the prior act is not too remote in time; (3) the prior act is similar (if admitted to show intent); (4) the prior act is used to prove a material element; and (5) the probative value of admitting evidence of the prior act is not substantially outweighed by any prejudice the defendant may suffer as a result of its admission.  See McDowell v. Calderon, 107 F.3d 1351, 1366 (9th Cir.) (sentencer

may rely on prior criminal conduct not resulting in a conviction if the evidence has "some minimal indicium of reliability beyond mere allegation"), amended, 116 F.3d 364 (9th Cir. 1997), vacated in part by 130 F.3d 833, 835 (9th Cir. 1997) (en banc); Walters, 45 F.3d at 1357-58 (upholding state admission of prior on federal habeas review); Sanders v. Housewright, 603 F. Supp. 1257, 1259 (D. Nev. 1985) (same), aff'd, 796 F.2d 479 (9th Cir. 1986); see also United States v. Sneezer, 983 F.2d 920, 924 (9th Cir. 1992) (upholding admission of prior on direct review on similar grounds), cert. denied, 510 U.S. 836 (1993).

The trial court found the evidence of the ATM robbery admissible under California Evidence Code section 1101(b).  Reviewing the state trial court's admission of the other crimes evidence, the state appellate court concluded as follows:

> "Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things... the intent with which the perpetrator acted in the commission of the charged crimes.  (Evid. Code, § 1101.)  Evidence of uncharged crimes is admissible to prove... intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of... intent. [Id.] On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion. [Citations]' [Citation]" (People v. Kipp (1998) 18 Cal.4th 349, 369.)
> "The lease degree of similarity between the uncharged act and the charged offense) is required in order to prove intent."  (People v. Ewoldt (1994) 7 Cal.4th 380, 402.)  "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (Ibid.)
> In the instant case, whether [Petitioner] harbored the requisite intent to rob the occupants of the Felix Way house was a disputed material issue. [Petitioner] admitted being near a house early one Friday morning with a BB gun when others he was with went inside the house, but he denied taking part in a robbery there.  On the prior robbery, [Petitioner] admitted going to a bank with two other people with the intent to rob somebody but denied taking part in the actual robbery. [Petitioner]'s prior robbery conviction had a strong tendency to prove that [Petitioner] had the intent to rob somebody when he went with others to the house that early Friday morning.  "'If a person acts similarly in similar situations, he probably harbors the same intent in each instance"[citations], and...such prior conduct may be relevant circumstantial evidence of he actor's most recent intent... The evidence of [Petitioner]'s prior robbery was sufficiently similar to his statement

regarding the charged offence to support the interference that he probably harbored the intend to rob in both incidents.  The court did not abuse its discretion in admitting evidence to [Petitioner]'s prior robbery conviction."

(Resp't Ex. C at 9-10.)

Petitioner's claim is meritless as permissible inferences could be drawn from the evidence of the ATM robbery.  The state courts were justified in relying on evidence taken from a recent crime in which Petitioner was undeniably involved, as his conviction for that crime established.  See McDowell, 107 F.3d at 1366.  The record supports the state courts' holding that the facts of the ATM robbery are sufficiently similar to the facts of the Felix Way robbery to permit an inference of intent.  As noted above, both cases involved multiple attackers, the attacks were apparently planned in advance, the victims were struck in the head, and large amounts of money were taken. (RT at 602-03.)  As with the 2000 robbery, in which Petitioner ultimately pled guilty to having committed a robbery despite having initially denied that he was an active participant, Petitioner told police in the present case that he had been at the crime scene when the Felix Way robbery occurred, but that he did not participate in the crime's actual commission.  (Id. at 603.)  Because the record indicates numerous parallels between Petitioner's conduct in the ATM robbery and his conduct in the charged offense, the state courts' finding that there is at minimum "the least degree of similarity" between the circumstances to permit the inference of intent was not clearly erroneous, arbitrary, or fundamentally unfair, and thus did not constitute a violation of due process.  See Jammal, 926 F.2d at 920.  Accordingly, the state courts' rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state appeal.  See 28 U.S.C. § 2254(d).

b.      Evidence of Co-defendant's Guilty Plea

Petitioner additionally claims that he was denied a fair trial when the court allowed the jury to learn in the middle of trial that codefendant Jahtamari Davis had

1    pleaded guilty to the Felix Way robbery.  (Pet. Attach. C at 5.)  The state appellate

2    court held that because Petitioner consented to the admission of the evidence at trial, he

3    could not object to its admission on appeal.  (Resp't Ex. C at 17.)  Because Petitioner is

4    procedurally barred from attacking the admission itself, he instead claims that his

5    attorney's failure to object to the admission of this evidence constituted ineffective

6    assistance of counsel.  (Pet. Attach. C at 8.)  When Petitioner advanced this alternative

7    ground for relief at the state appellate level, the appellate court held that the decision

8    by Petitioner's counsel to allow the evidence to be admitted did not amount to

9    ineffective assistance as established by the Supreme Court in Strickland v.

10   Washington, 466 U.S. 668 (1984).  (Resp't Ex. C at 18.)

11          A claim of ineffective assistance of counsel is cognizable as a claim of denial of

12   the Sixth Amendment right to counsel, which guarantees not only assistance, but

13   effective assistance of counsel.  Strickland, 466 U.S. at 686.  The benchmark for

14   judging any claim of ineffectiveness must be whether counsel's conduct so undermined

15   the proper functioning of the adversarial process that the trial cannot be relied upon as

16   having produced a just result.  Id.  The right to effective assistance counsel applies to

17   the performance of both retained and appointed counsel without distinction.  See

18   Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

19          In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

20   Petitioner must establish two things.  First, he must establish that counsel's

21   performance was deficient, i.e., that it fell below an "objective standard of

22   reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-88.

23   Second, he must establish that he was prejudiced by counsel's deficient performance,

24   i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors,

25   the result of the proceeding would have been different."  Id. at 694.  A reasonable

26   probability is a probability sufficient to undermine confidence in the outcome.  Id.

27          To establish that counsel's performance was deficient, Petitioner must show that

28   counsel made errors so serious that counsel was not functioning as the "counsel"

1    guaranteed by the Sixth Amendment.  See id. at 687.  Petitioner must show that

2    counsel's representation fell below an objective standard of reasonableness.  See id. at

3    688.  The relevant inquiry is not what counsel could have done, but rather whether the

4    choices made by counsel were reasonable.  See Babbitt v. Calderon, 151 F.3d 1170,

5    1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must be highly

6    deferential, and a court must indulge a strong presumption that counsel's conduct falls

7    within the wide range of reasonable professional assistance.  See Strickland, 466 U.S.

8    at 689; Wildman v. Johnson, 261 F.3d 832, 838 (9th Cir. 2001) (finding no deficient

9    performance by counsel who did not retain a ballistics expert on a menacing charge

10   where the same expert had been used in the successful defense of the same defendant

11   on a felon-in-possession charge); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.

12   1994).  But cf. United States v. Palomba, 31 F.3d 1456, 1466 (9th Cir. 1994)

13   (presumption of sound trial strategy not applicable where indicia of tactical reflection

14   by counsel on issue absent from record).

15        Tactical decisions of trial counsel deserve deference when: (1) counsel in fact

16   bases trial conduct on strategic considerations; (2) counsel makes an informed decision

17   based upon investigation; and (3) the decision appears reasonable under the

18   circumstances.  See Sanders, 21 F.3d at 1456.  Whether counsel's actions were indeed

19   tactical is a question of fact considered under 28 U.S.C. § 2254(d)(2); whether those

20   actions were reasonable is a question of law considered under 28 U.S.C. § 2254(d)(1).

21   Edwards v. LaMarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

22        In addition to satisfying the "unreasonableness" prong of Strickland's two-part

23   test, Petitioner must show that counsel's errors were so serious as to deprive the

24   defendant of a fair trial, a trial whose result is reliable.  Strickland, 466 U.S. at 688.

25   The test for prejudice is not outcome-determinative, i.e., Petitioner need not show that

26   the deficient conduct more likely than not altered the outcome of the case; however, a

27   simple showing that the defense was impaired is also not sufficient.  Id. at 693.

28   Petitioner must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694.

Where the petitioner is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" Luna v. Cambra, 306 F.3d 954, 961 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 695); see, e.g., Plascencia v. Alameda, 467 F.3d 1190, 1201 (9th Cir. 2006) (ineffective assistance of counsel claim not established because "any prejudicial effect was at best minute" from counsel's failure to object to evidence about existence of a drug in murder defendant's system where only killer's identity was in dispute).

The Strickland prejudice analysis is complete in itself.  Therefore, there is no need for additional harmless error review pursuant to Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Musladin v. Lamarque, 555 F.3d 830, 834 (9th Cir. 2009); Avila v. Galaza, 297 F.3d 911, 918 n.7 (9th Cir. 2002).  Strickland's framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.

In the instant case, Petitioner has not met his burden under Strickland.  With respect to the deficient performance prong of Strickland, Petitioner has failed to establish that his counsel made an objectively unreasonable choice in attempting to take tactical advantage of Davis' guilty plea.  Although he ultimately failed to persuade the jury of Petitioner's innocence, counsel's strategy was not unreasonable when viewed in the context of the facts of the case.  See Sanders, 21 F.3d at 1456.  As Respondent notes, counsel cited Davis' guilty plea to support two separate theories of Petitioner's innocence. (Resp't at 25-26.)  First, counsel cited the guilty plea to cast doubt on the identity of the perpetrators of the Felix Way robbery.  Counsel argued that the facts made it clear that Curiel, Gentry, and Henderson committed the robbery, but

that there may have been a fourth robber.  (RT at 1978.)  He argued that if so, it was probably either Davis, given that he had pled guilty, or possibly Weaver.  (Id. at 1983.) Additionally, to support counsel's argument that Petitioner had made a written statement only out of his fear that a jury would disregard his claims of innocence, counsel suggested that Davis might have pled guilty for no other reason than that he was "a scared kid that didn't think his attorney would be believed or the jury would believe it based on the evidence."  (Id. at 1981.)  In light of the record, counsel's tactics were not objectively unreasonable, and thus his strategical decisions are entitled to deference. See Sanders, 21 F.3d at 1456.  Accordingly, the state court's rejection of Petitioner's claim of ineffective assistance of counsel was not contrary to or an unreasonable application of clearly established federal law.  See Yarborough, 1 U.S. at 5; see also 28 U.S.C. § 2254(d).

Even assuming that Petitioner has established that his attorney's decision not to object to the evidence of Davis' guilty plea was objectively unreasonable, he has failed to show that but for counsel's ineffective assistance, the outcome of the case would have been different.  See Strickland, 466 U.S. at 694.  As noted above, the prosecution based its case primarily on the compelling evidence provided by Gentry and Henderson.  The case did not in any way hinge on the jury's awareness of Davis' guilty plea, and thus even if it had been unreasonable for counsel to allow this information to reach the jury, it cannot be said that any resulting prejudice would have undermined confidence in the outcome.  Id.

### c.   Evidence of Poverty

Petitioner next claims that his due process rights were violated by the admission of evidence that he and his co-defendants were short of money prior to the robbery. (Pet. Attach. C at 8.)   The state appellate court found that evidence of Petitioner's poverty prior to the robbery was admissible when viewed in conjunction with evidence of an upturn in his financial situation immediately after the charged crime occurred. (Resp't Ex C at 23.)  The Court finds that the admission of the evidence of Petitioner's

1    poverty did not constitute a due process violation and thus does not entitle him to

2    habeas relief.

3         Courts should not permit the admission of evidence of a defendant's poverty if

4    such evidence serves as the sole basis for the prosecution's claim that the defendant

5    possessed the requisite motive to commit a crime. See United States v. Mitchell, 172

6    F.3d 1104, 1108 (9th Cir. 1999) ("Evidence of poverty is not admissible to show

7    motive, because it is of slight probative value and would be unfairly prejudicial to poor

8    people charged with crimes"). However, evidence of poverty is admissible to the

9    extent that it eliminates alternative explanations for a defendant's sudden access to

10   funds following a theft offense. United States v. Jackson, 882 F.2d 1444, 1449 (9th

11   Cir. 1989).

12        The state appellate court acknowledged the general rule that evidence of a

13   defendant's poverty, "without more," is inadmissible to establish motive to commit

14   robbery "because it is unfair to make poverty alone a ground of suspicion." (Resp't

15   Ex. C at 27, quoting People v. Edelbacher, 47 Cal.3d 983, 1024 (1989)). However, the

16   state appellate court added that "evidence of poverty or indebtedness may be relevant

17   and admissible in some circumstances. Thus, 'the sudden possession of money,

18   immediately after commission of a larceny, by one who before that had been

19   impecunious, is clearly admissible as a circumstance of the case.'" (Id., quoting People

20   v. Kelly, 132 Cal. 430-32 (1901)).

21        The state appellate court held that "evidence of [Petitioner]'s indebtedness and

22   his eviction from his apartment, coupled with Gentry's eviction from the apartment

23   they subsequently shared, prior to the robbery, and Petitioner's payment of his debts

24   immediately afterward, had 'substantial relevance'" to explain [Petitioner]'s motive for

25   the robberies and that "this relevance clearly outweighed the risk of undue prejudice."

26   (Resp't Ex. C at 23, quoting Edelbacher, 47 Cal.3d at 1024). The state appellate court

27   found that on these facts, the evidence was properly admitted by the prosecutor as

28   circumstantial evidence that Petitioner's sudden access to money could be explained as

1    the result his participation in the robbery.

2        This Court concludes that the trial court did not violate Petitioner's due process

3    rights by admitting evidence of Petitioner's poverty.  Federal law mirrors the California

4    rule applied by the state appellate court in allowing the admission of evidence of

5    poverty where this evidence is presented alongside evidence of an otherwise

6    inexplicable improvement in Petitioner's financial circumstances after the charged

7    offense took place.  See Jackson, 882 F.2d at 1449.  As this rule permits the

8    introduction of evidence of Petitioner's poverty in the present case, the jury could draw

9    permissible inferences from this evidence.  See Jammal, 926 F.2d at 920.  Accordingly,

10   the state courts' rejection of this claim was not contrary to or an unreasonable

11   application of, federal law, nor was it based on an unreasonable determination of the

12   facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. §

13   2254(d).

14       4.    Failure to Give Proper Jury Instructions

15       Finally, Petitioner claims that he is entitled to habeas relief because the trial

16   court did not instruct the jury sua sponte on the law of conspiracy.  (Pet. Attach. D at

17   6.)  Although no formal conspiracy charges were brought against Petitioner or any of

18   his codefendants, the prosecutor argued that Petitioner and his codefendants were

19   members of an uncharged conspiracy.  (Resp't Ex. C at 18.)  Petitioner claims that he

20   was deprived of his Sixth and Fourteenth Amendment rights when the court failed to

21   instruct the jury on the law of conspiracy and on the necessity of making an

22   individualized determination of guilt for each defendant.  (Pet. Attach. D at 1.)  He

23   contends that the jury should have been given the instructions provided in CALJIC No.

24   6.10.5, CALJIC No. 6.22, and CALJIC No. 17.00.  Although the state appellate court

25   agreed that the trial court erred in not giving CALJIC Nos. 6.10.5 and 17.00, which

26   require separate determinations of guilt for each defendant, the court ultimately

27   rejected this claim, finding the omissions to be harmless in light of the evidence of the

28   group nature of the crimes and the fact that the jury returned different verdicts based on

1   each defendant's degree of culpability and level of participation in the crimes.  (Resp't

2   Ex. C at 21.)

3         Federal habeas relief will not be granted for failure to give an instruction unless

4   the ailing instruction, viewed in conjunction with all other instructions given and the

5   trial record, "so infected the entire trial that the resulting conviction violates due

6   process."  See Estelle v. McGuire, 502 U.S. 62, 72 (1991); Cupp v. Naughten, 414 U.S.

7   141, 147 (1973).  The instructional error must have "had a substantial and injurious

8   effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637 (quoting

9   Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

10        The omission of an instruction is less likely to be prejudicial than a

11  misstatement of the law.  See Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987)

12  (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner

13  whose claim involves a failure to give a particular instruction bears an 'especially

14  heavy burden' because "[a]n o mission or incomplete instruction is less likely to be

15  prejudicial than a misstatement of the law."  Henderson, 431 U.S. at 155.

16        Petitioner has not met his burden.  In rejecting this claim, the state court

17  concluded as follows:

18              The evidence in this case overwhelmingly showed a conspiracy to
        rob the occupants of the Felix Way house.  The evidence showed that
19      three men entered the Felix Way house early one Friday morning, with
        one carrying a BB gun and another a crowbar, while leaving a fourth man
20      outside as a lookout.  The men then robbed three residents of the house
        after shooting one with the BB gun and pistol-whipping another.
21      Henderson told Detective Mitchell that he saw [Petitioner], Davis, Joiner,
        and Gentry shortly after the robbery took place with items taken during
22      the robbery. Gentry admitted to Detective Mitchell that he was the
        lookout, and further said that [Petitioner], Davis, and Joiner were the
23      intruders and that [Petitioner] had the BB gun.  Davis admitted to
        Detective Mitchell that he was one of the robbers. [Petitioner] told
24      Detective Mitchell that he did not rob anybody, but he admitted carrying
        a BB gun one Friday morning and hitting somebody with it.  No evidence
25      was presented regarding any pretrial statements Joiner may have made.
        The jury found [Petitioner] guilty on all counts relating to the robberies
26      and found that he personally used the BB gun.  The jury also found
        Gentry guilty on all counts except assault with a deadly weapon, but
27      found all arming allegations not true.  It was unable to reach a verdict on
        any count as to Joiner.  Under the circumstances, it is clear that the jury
28      "decide[d] separately whether each of the defendants [was] guilty or not

guilty." (CALJIC No.17.00.)  Therefore, it is not reasonably probable
that the jury would have reached a different verdict as to [Petitioner] had
it been instructed in the language of CALJIC No.17.00.  (People v.
Watson, (1956) 46 Cal.2d 818, 836.)  And, as the facts overwhelmingly
established [Petitioner]'s participation and role in the robberies, it is not
reasonably probable that the jury would have reached a different verdict
as to [Petitioner] had it been instructed in the language of CALJIC No.
6.10.5. (See People v. Sully, 53 Cal.3d 1195, 1231-32 (1991)).

(Resp't Ex. C at 20-21.)

The state appellate court's rejection of Petitioner's claim was wholly consistent

with Estelle. 502 U.S. at 72.  There is no indication that the omission of  the

conspiracy instructions "had a substantial and injurious effect or influence in

determining the jury's verdict."  Brecht, 507 U.S. at 637.  The weight of the evidence,

including the testimony of Gentry and Henderson, clearly implicated Petitioner as a

participant in the robbery.  Further, as the state appellate court noted, the jury

determined the guilt of Petitioner and of each co-defendant separately, as evidenced by

different verdicts as to each of the convicted parties.  Accordingly, the state courts'

rejection of this claim was not contrary to or an unreasonable  application of federal

law, nor was it based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).


## CONCLUSION

The Court concludes that Petitioner has not shown any violation of his federal

constitutional rights in the underlying state criminal proceedings.  Accordingly, the

petition for a writ of habeas corpus is denied.  The Clerk shall enter judgment and close

the file.

IT IS SO ORDERED.

DATED: ___8/31/2009___                    _____
                                          JEREMY FOGEL
                                          United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


JAMES E JOHNSON,

                Petitioner,

  v.

KATHY PROSPER, Warden,

                Respondent.
                                  /

Case Number: CV07-02574 JF

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on _____8/31/2009_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


James E. Johnson V-20792
CSP-Solano II
California State Prison-Solano
P.O. Box 4000
Vacaville, CA 95696


Dated: ___8/31/2009_____

                                    Richard W. Wieking, Clerk